## THE MISSISSIPPI WIRE GLASS COMPANY

*v.*

## CONTINUOUS GLASS PRESS COMPANY.

[Decided October 18th, 1911.]

1. Where a corporation manufacturing wire glass is the successor of one which controlled process patents for such product, the words "wire glass" are merely descriptive, and such corporation cannot restrain their use by another company manufacturing a similar glass, on the ground that their use to designate the product of the complainant while it had the exclusive right of manufacture has so identified them with its product as to give them a secondary meaning, and to give it a property right therein, where there is no showing that after competition was established by the expiration of the patents the name was generally used to designate complainant's product in distinction to the product of other manufacturers.

2. A corporation manufacturing wire glass has no exclusive right to use therein wire with a particular mesh, where the idea as to the construction of the glass and the use of that form of mesh is not original with it or its predecessors, and it has no patent thereon, as to give it that right would have the effect of destroying competition in the manufacture of unpatented articles.

3. In a suit to enjoin the doing of acts alleged to have been designed to mislead the public and to induce the belief that wire glass produced by defendant was that of complainant, evidence *held* to show no attempt by defendant to mislead the public in making and marketing a similarly appearing glass.

Hearing on pleadings and proofs.

*Messrs. Griggs & Harding,* for the complainant.

*Mr. Richard V. Lindabury* and *Mr. Stoughton,* for the defendant.

STEVENS, V. C.

The complainant seeks to obtain an injunction against the defendant to restrain it, first, from using the term "wire glass" in

connection with its manufacture; second, from using, manufacturing or selling glass plates with wire mesh imbedded therein, identical with or like that manufactured and sold by complainant; third, from doing any act or using any artifice calculated to induce the belief that any glass plates with wire mesh imbedded therein and not marketed by complainant are complainant's.

Wire glass is a comparatively new product. It is useful because it prevents the glass in which it is embedded from falling, if cracked, and because it is a valuable fire retardant. Its history, so far as this country is concerned, is as follows: In 1891 a Mr. Forrest showed Frank Shuman a small sample of wire glass having a hexagonal mesh about seven-eighths of an inch in diameter that had been found in a condemned express package, and asked him whether he could get up a machine for making this kind of material on a large scale. He made and patented a process for so doing. "Everybody," says Mr. Shuman in his evidence, "connected with the sample, and the men working at the experimental works instinctively called it 'wire glass.'" A commercial article was produced which Mr. Shuman says "was practically the same in form, size and shape of mesh" as the sample. The process patents for its manufacture were taken out in 1892. In that year the wire glass company and the American Wire Glass Manufacturing Company were incorporated in Pennsylvania to manufacture the article and the Shuman patents were transferred. They have now expired. In 1894, the complainant, the Mississippi Wire Glass Company, acquired the rights of the American Wire Glass Manufacturing Company, and has ever since been engaged in the manufacture of wire glass. Prior to 1901 three other companies began to manufacture it but were soon absorbed by the complainant. In June, 1901, the defendant company was incorporated. It first manufactured a wire glass which it called "Sinusoidal," on account of the peculiar waviness of the wire. The wire went from face to face of the glass and did not lie in one plane through its centre. But its manufacture in this way was, according to Mr. Cox, its president, soon abandoned, because of a change in the rules of the National Board of Underwriters; the new rules re-

quiring "the plane of the wire mesh to be practically midway between the two surfaces of the glass."

The glass now manufactured by defendant is very similar to that manufactured by complainant. It has, however, two distinguishing marks: the so-called ghost mark, made by the introduction of the wire into the melted glass, and the cable strand or double wire, inserted for the purpose of identification and appearing at intervals of nine inches. Of these, the latter is the more easily seen. Unless pointed out they would, probably, not be remarked by the ordinary observer. As distinguishing marks, they enable the expert, be he manufacturer, engineer or architect, to identify the manufacture.

*First.* It seems to me plain that the complainant has no property right in the name. It is accurately descriptive of the article. It has been its name, in this country, ever since it was made either by complainant or by others; and in Germany, (draht glass) for as long as, or longer than it has been here.

But it is said that though originally descriptive, it has acquired a secondary meaning; that it means the product of complainant. As to this I need only refer to what was said in *Cellular Clothing Co.* v. *Maxton & Murray (1899), A. C. 326.* There the effort was to persuade the house of lords that the word "cellular" as applied to woven underwear had come to be understood as meaning the manufacture of plaintiff. After referring to the case of a fancy name which is capable of exclusive appropriation, Lord Shand says: "A wholly different principle must apply in the case of goods which are sold under a merely descriptive name. If a person employing a word or term of well known signification and in ordinary use, though he is not able to obtain a patent for his manufacture and although he has not got the protection of a registered trade mark for the goods he is proposing to sell, is yet able to acquire the right to appropriate a word or term in ordinary use in the English language to describe his goods, and to shut others out from the use of this descriptive term, he would really acquire a right much more valuable than either a patent or a trade mark; for he and his successors in business would gain the exclusive right, not for a limited time as in the case of a patent, but for all time coming, to use the word

as applicable to goods which others may be desirous of manufacturing and are entitled to sell and manufacture as well as he." And Lord Davey says: "There are two observations which must be made: one is that a man who takes upon himself to prove that words which are merely descriptive or expressive of the quality of the goods have acquired the secondary sense to which I have referred, assumes a much greater burden—and indeed a burden which it is not impossible but at the same time extremely difficult to discharge—a much greater burden than that of a man who undertakes to prove the same thing of a word not significant and not descriptive, but which has been compendiously called a 'fancy' word.

"The other observation which occurs to me is this: that where a man produces or invents, if you please, a new article and attaches a descriptive name to it—a name which as the article has not been produced before, has of course not been used in connection with the article—and secures for himself either the legal monopoly or a monopoly in fact of the sale of that article for a certain time, the evidence of persons who come forward and say that the name in question suggests to their minds and is associated by them with the plaintiff's goods alone, is of a very slender character, for the simple reason that the plaintiff was the only maker of the goods during the time that the monopoly lasted and therefore there was nothing to compare with it and anybody who wanted the goods had no shop to go to or no merchant or manufacturer to resort to except the plaintiff."

These observations are directly applicable to the case in hand. The article "wire glass" was necessarily understood to be of complainant's manufacture while it alone manufactured it. But competitors soon appeared and called their product wire glass and sold it under that name. Aside from the difficulty on the score of time, the evidence fails to convince me that it has been generally used to denote complainant's product in contradistinction to the product of others.

*Second.* Complainant's next contention is that while it has no exclusive right to manufacture wire glass, it has the right to enjoin defendant from manufacturing glass with a mesh similar to or identical with complainant's; in other words, that defend-

ant cannot put into its glass a wire mesh of the same form, size and thickness of wire as complainant puts into its glass. As I have already said, the mesh used by complainant was not original with it. It was copied from a sample found in a condemned express package. If complainant's contention be sound, then although it has no patent and could not obtain one, it has the right for all time, exclusively to manufacture the article in a form which had been used before and which it only copied—a much more valuable monopoly than that which any patent could have given it. It is obviously not the law that different manufacturers may not manufacture the same unpatented article in competition.

We come, then, to the last contention, viz., that defendant is using artifice to induce the public to believe that its goods are complainant's, and that it is endeavoring to pass off its goods as such. The mere fact that defendant makes and sells a similar article and calls it wire glass, is not, of itself, evidence of such an endeavor. I fail to find any proof of what may be called "unnecessary imitation"—imitation designed to mislead.

The evidence shows that variations in the form and appearance of the product must be slight if a merchantable article is to be manufactured at all. The rules of the national board of fire underwriters make this very clear.

Rule *b*, as found in the edition of 1901, reads as follows: "No glass shall be accepted of less thickness than one-quarter of an inch (full), if rough plate, ribbed or figured," &c.

Rule *c*. "No glass shall be accepted with mesh larger than one inch, and with such mesh, no wire of smaller size than No. 22 B. & S. wire gauge shall be used."

In the edition of 1906, rule *c* was altered. The maximum size of mesh was changed from one to seven-eighths of an inch, and the size of wire to "nothing smaller than 24 B. & S. gauge," instead of 22 B. & S. gauge. In other words, permission was given to use a wire whose gauge was very slightly, and to the ordinary observer, imperceptibly smaller than was prescribed before.

The evidence would indicate that the hexagonal shape has, in this country at least, been found to be the best in practice. Mr. Cox says that it tends to keep its shape and that the optical effect

of it is better. Be this as it may, the hexagonal shape is that of the original sample and the complainant has no exclusive property in it.

Now, as the glass is sold largely, if not principally, as a fire retardant, it is obvious that if it is to be put upon the market, compliance with the rules of the underwriters is of the first importance, for it means reduced insurance rates to the consumer.

According to these rules the glass must be at least one-quarter of an inch thick. No manufacturer is likely to waste material in making it thicker, if he is not obliged to. Then the mesh must be of no greater diameter than seven-eighths of an inch and no smaller than gauge 24 B. & S. If the manufacturer would compete successfully with his rival, he is not going, willingly, to use a wire thicker and harder to cut or a mesh smaller than the laboratory experiments conducted by the underwriters have shown to answer the purpose. If this be conceded, and if the hexagonal shape may be used, then the limit of variation is very small indeed. It would be hardly noticeable by the ordinary observer. In this aspect of the case it is like that of two manufacturers selling in competition the same product, be it glass, cloth or other staple article.

The correspondence with the Wickwire Brothers, so largely relied upon, is capable of a twofold construction. These gentlemen are manufacturers of wire mesh and they supplied the complainant with it. They also, in the beginning, supplied defendant with it, making for the defendant a slightly thicker wire. After awhile Mr. Cox wrote for a thinner wire (No. 24 Washburn and Moen gauge), "exactly the same mesh as the Mississippi company uses." Now, Cox may have written this with intent to imitate or with intent merely to characterize and explain. He says it was with the latter intent—that he had found that the jobbers were complaining that his glass was harder to cut and that there having arisen between himself and the Wickwire Brothers a misunderstanding as to what was meant by the appellation 24 B. & S., he wanted to make his meaning perfectly clear. Now, I take it, that if he had the right to use the wire at all, he had the right to characterize it in terms that were unmistakable. If anything was going to deceive the public, it was the wire itself, after it was put

into the glass—not the description of it, intended only for its maker. If it was lawful for defendant to use that kind of mesh, I am at a loss to understand how the order so given could, in the words of the prayer for injunction, be regarded as an artifice calculated to induce *in the public* the belief that defendant's glass was of complainant's manufacture. The case comes down to this: could defendant lawfully use hexagonal wire mesh of the gauge 24 B. & S.? If it could, it cannot be held that it was intending a fraud when it described it as it did to the Wickwire Brothers.

Has the defendant, then, having the legal right to make the wire glass, put it upon the market under false colors? There is no proof that it has. It labels each sheet with its own name, in the ordinary way, and it distinguishes it further by the ghost mark and by the cable strand inserted every nine inches—a method of differentiation acceptable to and accepted by the board of underwriters. There is some evidence that jobbers have occasionally substituted defendant's glass for complainant's, but the proof does not show that this kind of practice has been sanctioned or encouraged by defendant.

I think the bill should be dismissed, with costs.