20 N.J. Super. 325 (1952)
90 A.2d 50
FRENCH AMERICAN REEDS MANUFACTURING CO., INC., PLAINTIFF-APPELLANT,
v.
PARK PLASTICS CO., INC., AND CHRIS-KRATT INSTRUMENT CO., INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 1952.
Decided June 30, 1952.
*328 Before Judges McGEEHAN, JAYNE and GOLDMANN.
Mr. Walter J. Bilder argued the cause for appellant (Messrs. Bilder, Bilder & Kaufman, attorneys).
Mr. Edward Gaulkin argued the cause for respondents (Messrs. Reed, Reynolds & Smith, attorneys).
The opinion of the court was delivered by GOLDMANN, J.A.D.
Plaintiff seeks to restrain defendants from unfairly competing with it in the manufacture and *329 sale of plastic ukeleles. It maintains that defendants' "Flamingo" ukelele so closely resembles its "Islander" in shape, design, color, price and packaging as "to create a likelihood that the ordinary buyer will mistake defendants' ukelele for the plaintiff's * * * and buy the defendants' ukelele when seeking to buy the plaintiff's ukelele in the belief that he is buying the plaintiff's ukelele." Defendants, in turn, maintain that for plaintiff to prevail it must prove that the "Islander" acquired a secondary meaning in the ukelele market.
These are the issues framed by the pretrial order and contested in the trial of the cause. Infringement of trade-mark or trade name is not here involved. Nor does this action implicate the question of "palming off" or "passing off"  "fraudulent marketing," as the Restatement of the Law of Torts (1938), vol. 3, § 711, p. 542, denotes it  of defendants' ukelele as plaintiff's product. In fact, plaintiff expressly disavows that "palming off" is an issue; its reply brief states that its claim "does not involve any element of actual intent or any attempt on respondents' part to sell their goods as those of appellant."
The trial court denied plaintiff's initial application for an injunction pendente lite and after full hearing denied its demand for a permanent injunction and an accounting. 14 N.J. Super. 450 (Ch. Div. 1951). It found, among other things not here pertinent, that plaintiff's "Islander" plastic ukelele, although a pioneer in the field, had not been in the market "a sufficient length of time and with such a degree of success as to acquire secondary meaning." We agree.
Plaintiff's inspiration to produce a plastic ukelele of standard size came from a sudden boom in the sale of the conventional wooden ukelele which began on the west coast early in 1949 and spread across the nation. The boom was largely due to Arthur Godfrey, a well-known radio and television performer, who played a ukelele on his programs.
Mario Maccafferi, president of the plaintiff corporation, conceived the idea of making a plastic ukelele in April, 1949. *330 He developed the "Islander" design after studyng several different wooden ukeleles. Plaintiff went into regular production in January 1950, but produced only 29 ukeleles that month. It made 1,188 in February, 18,900 in March, 35,706 in April, 51,512 in May, and 29,391 in June when defendants' plastic model appeared  a total up to that time of 136,726. Production for July was 26,159. This action was instituted August 7, 1950.
The history of defendants' "Flamingo" plastic ukelele is this: Christian Kratt, president of defendant Chris-Kratt Instrument Co., Inc., first thought of the possibility of making a plastic ukelele in March 1949. While on a Canadian trip in July 1949 he saw and purchased a toy plastic ukelele, and it was then he realized that a standard model could also be made of plastic. However, he did not act on the idea until October 1949, after he had returned from a business trip to Europe.
Meanwhile an employee of defendant Park Plastics Co., Inc., after seeing Godfrey on a television show in early October, suggested to its president Arthur Lange the idea of making a plastic ukelele. Some days later Lange met Kratt and asked what he thought of the proposal. Kratt told him that he, too, had been thinking of a standard-size plastic ukelele. He gave Lange the toy ukelele he had bought in Canada and a regular wooden one to study. Shortly thereafter Lange determined that a standard model in plastic was feasible and could compete in the musical instrument market against the conventional ukelele. Preliminary sketches were made and then, from January through early March 1950, detailed drawings of parts and dies were prepared. Work on the steel mold had begun as early as January.
Defendants' final model was a composite of different ukeleles that had served as models, among them several wooden ones, the plastic "Islander" and another plastic ukelele, the "Fin-Der." Production of defendants' "Flamingo" began in June 1950.
*331 Plaintiff instituted its advertising campaign for the "Islander" ukelele in January 1950, with striking advertisements in the trade papers. Company and distributor advertising continued in these publications and in newspapers down to the time this action was instituted. There were also the usual publicity releases and display pieces. In March 1950, Godfrey began to mention and play the "Islander" on some of his programs, and this continued to June 1950. He also mentioned other makes of ukeleles, among them, subsequently, the "Flamingo."
To the uncritical eye both the "Islander" and the "Flamingo" have the same general appearance. But there are differences in details. For example, the "Flamingo" has only four parts and the "Islander" nine, exclusive of plastic strings and metal pegs. The dimensions differ in significant respects, thus establishing the fact that defendants' ukelele could not, as charged by plaintiff, have been moulded from its "Islander" since normal tolerances and shrinkage would not account for the observed differences.
These differences would not, however, have much significance in an ordinary case of unfair competition involving "passing off," because there the test to be applied would be not the careful scrutiny of the discriminating purchaser, but the likely observation of the casual buyer. The resemblances between the two ukeleles would be an influential factor if the issue of secondary meaning were resolved in favor of the plaintiff. It could then urge, as it does here at some length, that there is a fatal similarity between defendants' "Flamingo" and its own "Islander"  in dimensions, coloration of corresponding parts, retail price, and the size, shape and design composition of the respective ukelele containers.
In this regard it should be observed in passing that defendants' ukelele has the name "Flamingo" in large letters, as well as a Hawaiian scene, stamped on the head of the instrument, thus identifying it for every buyer. Plaintiff's ukelele has "Islander" slanted across the head, with a distinctive seal and, in smaller letters, the words "Designed by *332 Maccafferi" beneath. Defendants' container has "Flamingo" in large block letters on top and at the ends; the "Islander" box is similarly marked.
A second observation is that plaintiff, in a proper case, could not successfully urge the contention it makes here  that defendants' ukelele offends because of its size and shape. These have been distinctive characteristics  in fact, part of the functional design  of the standard-size instrument since it was first introduced in America from Hawaii in the second decade of this century and became the collegiate fad of the 1920's. The Hawaiian instrument was the offshoot of the Portugese machete, a smaller member of the guitar family carried eastward to the islands by Portugese sailors and traders a century or more ago. The machete is, in turn, the modest descendant of the lute and its derivatives, so popular in the Renaissance and tracing back as far as 2,000 B.C. and the Cappadocians. See Sachs, The History of Ancient Instruments (1950) and Edgerly, From the Hunter's Bow (1942), passim. It is too late in the day for plaintiff to stake out any claim to the curves, depth of sounding box, and all the rest of the shaped structure that mark the ukelele for what it is.
The main stress of plaintiff's argument is on defendants' copying of the several features of the "Islander" ukelele and its container. It is not sufficient for a plaintiff in a case like this merely to prove copying, assuming for the sake of the argument that it has proved what has elsewhere been called "unreasonable imitation." Plaintiff's plastic ukelele was not patented at the time it filed its complaint, although an application for a patent was pending. In the absence of such a monopoly as a patent confers, any person may reproduce an article if he can, and sell it if he does not pass it off as having been made by plaintiff and plaintiff's product has not as yet acquired a secondary meaning in the market place. 3 Restatement, Torts (1938), p. 622; 1 Nims, Unfair Competition and Trade-Marks (4th ed. 1947), p. 370; 150 A.L.R. 1076 et seq.
*333 A case very much like this one is Ferber Corp. v. Northern Industrial Products, Inc., 15 N.J. Super. 283 (Ch. Div. 1951), affirmed per curiam, 18 N.J. Super. 493 (App. Div. 1952). There the plaintiff claimed that it was the first to use translucent plastic in the manufacture of pencil-shaped ball-pointed pens, and that as a result of excellence of workmanship and the promotional activities it had undertaken its translucent pen had come to be associated in the public mind with the plaintiff company [secondary meaning]. The court held that the record did not support the claim. It said (at pages 286-7):
"* * * Since the pen produced by the plaintiff is unpatented, there is no reason why defendant should not copy it, provided that in doing so, defendant does not seek to cheat the public and defraud the plaintiff. So long as defendant does not attempt to sell his goods as those of the plaintiff, he is not at fault. * * *
But even if we assume that plaintiff was a pioneer in this respect, it cannot be contended that thereby plaintiff became entitled to the exclusive use of translucent plastic. Plaintiff had no patent and, presumably, it could not get one. If its contention is sound, it is entitled to a monopoly more valuable and extensive than any patent could give. Such is not the law. * * *
There is no proof that the defendant has been guilty of any fraud. It may have copied the Ferber pen but that it had the right to do. In other respects Northern has been careful to distinguish its product from that of the plaintiff by plainly marking the barrel of its pen with the name of All-Rite Pen, Inc., the distributor. And there is no evidence to support a conclusion that the public has been confused or misled."
To the same effect, Mississippi Wire Glass Co. v. Continuous Glass Press Co., 79 N.J. Eq. 277 (Ch. 1911). There is no proof of fraud here, nor is fraud charged.
The principle applicable in this case and gathered from decisions throughout the country is set out in 3 Restatement, Torts (1938), § 741, pp. 622-3. One may market goods whose physical appearance is a copy or imitation of the physical appearance of the goods of which another is the initial distributor unless
"(b) the copied or imitated feature has acquired generally in the market a special significance identifying the other's goods, and
*334 (i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and
(ii) the copied or imitated feature is nonfunctional, or, if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other."
The comment on this clause appears on page 627 of the Restatement:
"* * * To subject the actor to liability under the rule stated in this Clause, the imitated feature must be regarded by prospective purchasers as identifying the source of the product. It is not sufficient that the feature is pleasing to them and that they desire goods having it. If that is the sole significance of the feature, competition would be unduly hampered by the prohibition of imitation. It is only when the feature in fact identifies source and the imitation is likely to deceive prospective purchasers who care about source that the imitator is subject to liability."
It was Judge Learned Hand who gave what is considered the classical explanation of secondary meaning. In Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299, 300-301 (C.C.A. 2 1917), he said:
"The cases of so-called `nonfunctional' unfair competition * * * [all] presuppose that the appearance of the article, like its descriptive title in true cases of `secondary' meaning, has become associated in the public mind with the first comer as manufacturer or source, and, if a second comer imitates the article exactly, that the public will believe his goods have come from the first, and will buy, in part, at least, because of that deception. Therefore it is apparent that it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person  the plaintiff may not be individually known  makes them, and that the public cares who does make them, and not merely for their appearance and structure. It will not be enough only to show how pleasing they are, because all the features of beauty or utility which commend them to the public are by hypothesis already in the public domain. The defendant has as much right to copy the `nonfunctional' features of the article as any others, so long as they have not become associated with the plaintiff as manufacturer or source. The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence."
*335 The first question, then, which plaintiff must answer here is whether its "Islander" ukelele or any of its distinctive features have acquired the necessary secondary meaning with the public. If not, then it may be copied, functional features as well as nonfunctional, and sold by defendants as long as defendants do not pass their ukelele off as having been made by plaintiff. It is only when the physical attributes of plaintiff's ukelele have acquired a secondary meaning that we come to the question whether defendants' copy is likely to deceive the ordinary purchaser into believing he is buying plaintiff's article. And it is not until this second question has been answered in the affirmative that we need consider whether the copied feature or features are functional or nonfunctional.
Among the many cases that illustrate the rule of secondary meaning only two need be mentioned. They clearly indicate the reaches of the rule and have often been cited in the state courts. Each of the cases involves an outright copying of plaintiff's product.
In Upjohn Co. v. Wm. S. Merrell Chemical Co., 269 F. 209 (C.C.A. 6 1920), cert. den. 257 U.S. 638, 42 S.Ct. 50, 66 L.Ed. 410 (1921), the plaintiff, a well-known manufacturer of pharmaceuticals, undertook to produce a laxative in the form of a thin, rectangular wafer, pink in color and with a specially compounded flavor, and scored across the center. Its trade name was "Phenolax." Plaintiff spent $30,000 in advertising and distributed samples across the country in quantity. Nation-wide sales in the first year ran into the millions of packages. About half a year after plaintiff began to make "Phenolax" defendant started to manufacture a tablet "indistinguishable" from plaintiff's, but packaged and sold under its own name and label as "phenolphthalein tablets." The court, in affirming the dismissal of plaintiff's bill, said (at pages 212-3):
"* * * It would not be credible that defendant adopted this combination of characteristics merely because it thought them suitable; there were plenty of other sizes, shapes, and colors it might have adopted; it must have copied plaintiff's complete combination *336 because it expected to get commercial benefit from the copying. This is not enough; to be condemned, it must have expected to practice a fraud or contribute to the practicing of it. * * *
The situation must be judged as it was about October, 1908, when defendant came on the market. * * * the best that can be said is that the stage was set for the formation of the phenolax habit  not that any appreciable fraction of the community had acquired it. Such a secondary meaning as is here involved comes gradually. We do not think it can be manufactured overnight by intensive advertising. There is, to our minds, no satisfactory basis for finding that about October, 1908, the consuming public had come to the belief that tablets of this appearance were `phenolax'; and short of such rather general belief, plaintiff could have no quasi exclusive right which was then infringed by defendant."
In Sinko v. Snow-Craggs Corp., 105 F.2d 450 (C.C.A. 7 1939), plaintiff manufactured and sold a steering wheel spinner knob with a colored button or jewel embedded in its center, surrounded by a tiny metal collar or bezel. The item caught the public favor, and defendant asked plaintiff to supply it with the jeweled knob. No agreement could be reached as to terms. Defendant thereupon began to manufacture a knob so similar in structure, coloring and ornamentation as to be "almost indistinguishable." It packaged and sold these knobs under its own name. The court, reversing the decree below in plaintiff's favor, said (at pages 452-453):
"There is no proof that Cragg was palming off its knobs as the merchandise of Sinko, or that the knobs were bought because they originated with the plaintiff. Viewing the evidence and all the inferences that may properly be drawn therefrom, it only establishes, at best, that Cragg knobs are similar in form and appearance, and we fail to find evidence in this case which would indicate that Sinko had established a reputation among consumers and dealers, whereby the trade dress in question had become associated with the source of supply. * * *
"Stated in a summary way, Sinko created a desire on the part of the public for one of two things, either for knobs made by Sinko, above all other knob makers, or for knobs made in a particular manner regardless of who made them. If it is the first situation, the law of unfair competition gives Sinko the right to monopolize or to exclude other makers from copying the product. If it is the latter situation, Sinko receives no such right to monopolize, even though he might have been the first one to make the article in the particularly desirable manner. It is unnecessary to repeat that the evidence in the *337 instant case shows that the public demand is for the article, not for the personality."
And see, generally, 3 Callmann, Unfair Competition and Trade Marks (2d ed. 1950), §§ 77.4 (e) (1) and (2), p. 1253 et seq.
The burden of proving that its plastic ukelele had acquired a secondary meaning in the musical instrument market  that the thought uppermost in the minds of the consuming public is not the product but the producer  was upon plaintiff. Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 235 F. 657, 664 (C.C.A. 6 1916). It was obliged to sustain that burden by a fair preponderance of the evidence. Gillette Safety Razor Co. v. Triangle Mechanical Laboratories Corp., 4 F. Supp. 319, 322 (D.C.E.D.N.Y. 1933); 2 Nims, Unfair Competition and Trade-Marks (4th ed. 1947), § 334, p. 1038; 3 Callmann, Unfair Competition and Trade Marks (2d ed. 1950), § 77.3, p. 1237.
The question whether plaintiff had at the time this action was instituted won for its "Islander" ukelele an identification with source in the minds of the public is a question of fact. Crescent Tool Co. v. Kilborn & Bishop Co., above Each case depends on its own factual circumstances. Upjohn Co. v. Wm. S. Merrell Chemical Co., above, at p. 213. Various elements may be considered in determining whether a secondary meaning has been acquired. Some of the more important ones are the period of time that has elapsed since the article first appeared on the market in its distinctive "trade dress," the nature and extent of popularizing and advertising the product, sales volume, and efforts to promote a conscious connection in the minds of the public between the product and its source. See 150 A.L.R. 1082 et seq. Cf. 3 Callmann, Unfair Competition and Trade Marks (2d ed. 1950), § 77.3, p. 1231 et seq.
Although the period of elapsed time is often referred to in secondary meaning cases, time is not an exclusive standard in determining whether such meaning has been acquired. Cf. 3 Restatement, Torts (1938), § 716, p. 560, Comment *338 (b). The ultimate test of secondary meaning must always remain whether plaintiff's product in its distinctive trade dress has become broadly known to the public as indicating a certain origin. The length of time required under this test cannot be measured as a matter of law by any positive criterion.
It is generally held that expenditures by a plaintiff in advertising his product are not, without more, persuasive evidence that such product has acquired secondary meaning in the public mind. Upjohn Co. v. Wm. S. Merrell Chemical Co., above, at p. 213. The scope, nature and duration of advertising the product are, at best, but factors to be weighed; "the issue is the achievement of an identity and not the effort expended in the attempted achievement." Premier-Pabst Corp. v. Elm City Brewing Co., 9 F. Supp. 754, 760 (D.C. Conn. 1935). Even the fact that a plaintiff's goods have become popular as a result of advertising does not necessarily establish a secondary meaning. Lewis v. Vendome Bags, Inc., 108 F.2d 16, 18 (C.C.A. 2 1939), cert. den. 309 U.S. 660, 60 S.Ct. 514, 84 L.Ed. 1008 (1940).
Similarly, the showing of a large volume of sales of an article claimed to have acquired a secondary meaning is not conclusive evidence of the acquisition of such meaning. Success in stimulating sales volume does not necessarily establish a secondary meaning for a particular product (Upjohn Co. v. Wm. S. Merrell Chemical Co., above), since conceivably such success may have resulted from methods of sales promotion having no tendency to create any specific association in the public mind between the product and a particular producer or source. Cf. Premier-Pabst Corp. v. Elm City Brewing Co., above. Sales volume figures merely tend to establish, or disprove, the existence of a secondary meaning.
In this case plaintiff's "Islander" had been in volume production only five months (February through June) when defendants' "Flamingo" appeared on the market. Plaintiff's advertising during the first six months of 1950, supplemented by that of its distributors and by any mention *339 which may have been given its product in trade journals, the press, or on Arthur Godfrey's radio and television programs over a New York station, cannot, after a review of the actual exhibits in the case, be said to have been of unusual proportions. Part of the exhibits indicate nothing more than the passing interest of the columnist or novelty writer in the ukelele boom. The "Islander" sales volume of 136,000 before the "Flamingo" appeared is not such as to indicate that plaintiff's plastic ukelele had captured the musical imagination of the country.
We note the absence of any direct evidence establishing the existence of an association between the "Islander" and some particular source of manufacture in the minds of a substantial number of the public  or for that fact, any segment of the public  who normally would be interested in the product and who might purchase it. To paraphrase the Sinko case, plaintiff created no desire on the part of the public for plastic ukeleles made by plaintiff, above all other makers of plastic ukeleles.
The best direct evidence of such secondary meaning would have been the testimony of the ultimate consumers. Testimony by the trade  jobbers and retailers  could also have been presented and considered. 2 Nims, Unfair Competition and Trade-Marks (4th ed. 1947), § 334, pp. 1038 et seq.
Since secondary meaning has not been established in this case, we need not consider whether the resemblance between the two ukeleles is founded on functional or nonfunctional features. American Fork & Hoe Co. v. Stampit Corp., 125 F.2d 472, 476 (C.C.A. 6 1942). See Restatement, Torts (1938), § 741(b) (ii), p. 623, quoted above, and § 742, p. 628.
The judgment below is affirmed.