**SK&F, Co.,**

v.

**PREMO PHARMACEUTICAL LABORATORIES, INC., Appellant.**

No. 79–2823.

United States Court of Appeals, Third Circuit.

Argued March 20, 1980.

Decided May 28, 1980.

As Amended June 12, 1980.

David M. McCann, Carpenter, Bennett & Morrissey, Newark, N. J., Donald R. Dunner (argued), Michael C. Elmer, Charles E. Lipsey, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D. C. of counsel; Alan D. Lourie, Janice E. Williams, SmithKline Corp., Philadelphia, Pa., for appellee SK&F, Co.

David B. Kirschstein (argued), Kirschstein, Kirschstein, Ottinger & Corbrin, P. C., New York City, for appellant Premo Pharmaceutical Laboratories, Inc.; Robert C. Podwil, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., of counsel.

Nancy L. Buc, Chief Counsel, Kathleen A. Blackburn, Asst. Chief Counsel for Enforcement Food and Drug Administration, Rockville, Md. for Food and Drug Administration as amicus curiae.

Sanford M. Litvack, Sp. Asst. to the Atty. Gen., Barry Grossman, Roger B. Andewelt, Robert J. Wiggers, Lois Friedman, Attys., Dept. of Justice, Washington, D. C., for United States as amicus curiae.

Milton A. Bass, Sheldon S. Lustigman, Bass, Ullman & Lustigman, New York City, for Nat. Ass'n of Pharmaceutical Manufacturers as amicus curiae.

Before ALDISERT and GIBBONS, Circuit Judges, and POLLAK *, District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Premo Pharmaceutical Laboratories, Inc. (Premo) appeals from an order prohibiting it, pending final hearing, from marketing a combination drug, Triam-Thiazide, an oral diuretic, in hard gelatin capsules having the same maroon and white color combination as the capsule used by SK&F, Co. (SKF) in marketing its product DYAZIDE, which contains the same combination drug. The order was entered in an action brought by SKF against Premo charging patent infringement, unfair competition, and the introduction into commerce of a false designation of origin or a false description or representation in violation of section 43(a) of the Lanham Act. 15 U.S.C. § 1125 (1976). Upon the filing of the complaint the district court issued an order directing Premo to show cause on December 17, 1979 why a preliminary injunction should not issue restraining it from infringing certain SKF patents, and from selling, offering for sale or advertising capsules containing the combination diuretic in the shape, color or other trade dress confusingly similar to DYAZIDE. A hearing was held on the return day. There was no request for a consolidation, pursuant to Fed.R.Civ.P. 65(a)(2), of the hearing on the preliminary injunction with the trial on the merits. At the conclusion of the preliminary injunction hearing the court, reserving decision on SKF's motion for pendente lite injunctive relief from patent infringement, granted the preliminary injunction appealed from herein. We affirm.

### I.

In 1965, after a long period of research and development, SKF began manufacturing and marketing a patented oral diuretic and hypotensive drug consisting of a compound of triamterene and hydrochlorothiazide under the trademark DYAZIDE. In the United States DYAZIDE is marketed as a powder contained in a maroon and white No. 3 hard gelatin capsule approximately ½ inch in length. On each half of the capsule the logos "DYAZIDE" and "SKF" are stamped. In Europe the same drug combination is sold in the form of an orange tablet, and on the record before us it appears that each form is equally effective. DYAZIDE is promoted through an extensive network of detailers who call on doctors, hospitals, and pharmacies, and is ad-

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

vertised in journals likely to reach the medical profession. Ultimate consumers may obtain the drug only by prescription. Because DYAZIDE is used to control hypertension, the course of therapy is generally an extended one. There are other oral diuretics on the market, but prior to November, 1979, DYAZIDE was the only one sold in capsule form, the only bi-colored diuretic, and the only diuretic using the color maroon. SKF's patent for the compound itself issued on March 12, 1963 and thus expired on March 12, 1980.

Premo is a manufacturer of generic pharmaceuticals. As it has done in other instances,[1] in late November 1979, near the expiration date of the SKF patent, Premo began to market a generic substitute for DYAZIDE, composed of the same active ingredients in powder form, and also contained in a No. 3 hard gelatin capsule approximately one-half inch in length. The Premo capsules are stamped with the logo "PREMO", but adopt the maroon and white color scheme that SKF had used for DYAZIDE for many years.

When SKF became aware of Premo's marketing of the generic substitute for DYAZIDE it filed a three count complaint. The first count charges patent infringement. Count II asserts diversity jurisdiction and charges unfair competition in violation of state law. Count III alleges a violation of section 43(a) of the Lanham Act. Both the state law and unfair competition count and the Lanham Act count are predicated upon Premo's deliberate adoption of the arbitrary and distinctive appearance of SKF's DYAZIDE capsules. The complaint alleges that Premo did so in order to place in the hands of the pharmaceutical trade capsules containing a mixture of triamterene and hydrochlorothiazide which can be and will be passed off and illegally substituted for DYAZIDE. The complaint alleges, further, that unscrupulous pharmacists can easily pass off the Premo capsules as SKF's, and that it was the intent, purpose, and natural effect of Premo's conduct in copying the DYAZIDE color scheme that such passing off could and would occur.

As we noted above, SKF sought preliminary injunctive relief both on patent infringement and on unfair competition grounds. The parties filed affidavits in support of or in opposition to the grant of such relief, addressing both the patent and the unfair competition issues. Counsel for Premo cross-examined the SKF affiants Fletcher and Dibble on the unfair competition aspects of the case, but did not offer any other oral testimony. During the testimony of Fletcher fifteen exhibits were introduced in evidence. There is no contention that this record was inadequate for the resolution of the preliminary injunction application or that Premo was prevented from developing an adequate record.

On the patent infringement count Premo conceded infringement. Premo contended that the patent was invalid because the diuretic value of triamterene was a known prior discovery, and its combination with hydrochlorothiazide to prevent the undesirable side effect of potassium loss associated with all diuretics was an obvious improvement. Both of these validity issues were contested. The trial court, recognizing that the patent validity issues were difficult, that the patent would expire before the case would be reached for final hearing, and that at that point the question of preliminary injunctive relief on the unfair competition count would have to be faced, chose to reserve decision on the request for preliminary relief on Count I. Since the patent has now expired, the injunctive aspects of Count I are moot, and the charge of patent infringement is relevant to this appeal, which involves only the issues of unfair competition, only to the extent that the admitted infringement may be evidentiary on those issues.

**1.** *Ives Labs., Inc. v. Darby Drug Co.*, 601 F.2d 631, 635 (2d Cir. 1979); *Boehringer-Ingelheim G.m.b.H. v. Premo Pharm. Labs., Inc.*, No. 79–738, slip op. at 6 (D.N.J. Mar. 15, 1979); *E. R. Squibb & Sons v. Premo Pharm. Labs., Inc.*, 195 U.S.P.Q. 545, 547–48 (S.D.N.Y.1977); *see Premo Pharm. Labs., Inc. v. Pfizer Pharm., Inc.*, 465 F.Supp. 1281, 1283–84 (S.D.N.Y.1979) (patent infringement issue).

SKF's affidavits tended to show that it had expended vast sums of money in the successful promotion of DYAZIDE in its present trade dress; that over the past 15 years doctors have prescribed DYAZIDE therapy for over twenty million patients, with the average course of therapy extending over many months or years; that during this extended course of therapy each patient may be expected to have consumed hundreds of DYAZIDE capsules, and to have noted the arbitrary and distinctive appearance of those capsules; that recognition of the DYAZIDE capsule's appearance is widespread; that of the 25 leading diuretics sold in the United States, and which account for 90 per cent of the diuretic market, the appearance of DYAZIDE is both arbitrary and distinctive because it is the only one marketed in capsule form, the only one marketed in a bi-color form, and the only one employing the color maroon; and that the drugs in the DYAZIDE compound could be marketed either in capsule or other dosage form, including tablet or lozenge form, as evidenced by the fact that SKF markets DYAZIDE abroad in the form of round orange tablets. SKF also filed affidavits tending to show the likelihood of undisclosed substitution and mislabeling by pharmacists when generic equivalents of popular drugs are marketed in a similar trade dress. Included in this showing was the testimony of Frederick N. Dibble describing the results of surveys on illegal substitution and mislabeling of the generic equivalents of Librium and Darvon Compound 65, which are drug products of other manufacturers, each with a market status similar to that of DYAZIDE. This showing also included the results of a three day survey, involving 70 to 80 purchases of diuretics, conducted in the week prior to the hearing on the preliminary injunction application. The SKF affiants Fletcher and Dibble were cross-examined extensively on the likelihood of undisclosed, illegal substitution and mislabeling. Dibble explained that the survey on illegal substitution and mislabeling of Librium was conducted be-

cause, like DYAZIDE it is a high volume prescription product. Unlike DYAZIDE, however, Librium is presently a compound available from several sources. From his experience in the drug industry Dibble concluded that when the patent expired and the DYAZIDE compound became available from multiple sources the substitution pattern would be similar to that currently experienced with Librium. He expressed the opinion that based on the Librium and Darvon evidence a 4% rate of unlawful substitution and a 23% rate of illegal mislabeling could be expected with a $100 million per year product such as DYAZIDE. In addition, Fletcher testified to the results of the three day DYAZIDE purchasing survey, in which four prescriptions were used.[2] Exhibit D-1A, a DYAZIDE prescription by Dr. Sheldon Kantor, under the applicable state law would permit a generic substitution only upon notification of the patient. Exhibit D-2A, a DYAZIDE prescription by Dr. Meyerson, as written, would permit a generic substitution, with patient notification and labeling on the bottle, only if the substitute was listed on the approved Pennsylvania formulary. Exhibit D-3A, also a DYAZIDE prescription by Dr. Kantor, as written, under the applicable state law would permit a generic substitution only with patient notification and labeling on the bottle. Exhibit D-4B, a prescription by Dr. Cipriano was written "substitution permitted," which would have permitted a generic substitution if the patient was notified and if the substitute was listed on the approved Pennsylvania formulary. Fletcher testified that in the survey, which involved approximately 70 to 90 purchases, there were four instances of illegal substitution. In each of the four cases there was a substitution of the Premo product without notification or labeling, and in the two Pennsylvania cases the Premo product was substituted although it was not listed on the Pennsylvania formulary.

Premo's presentation, except for cross-examination of Fletcher and Dibble, was

---

**2.** The survey, conducted over three days, involved having the various prescriptions filled in Miami, Chicago, and Philadelphia to determine the rates of illegal substitution or mislabeling.

made by affidavits. These affidavits concede that the color combination of the gelatin capsules used for Premo's Triam-Thiazide was chosen for the express purpose of identifying the Premo product with DYAZIDE. Edward Stemple, a pharmacist, swore:

It is the common practice in pharmacy and has been for many years prior to 1949, when I became a licensed pharmacist, for the manufacturers of generic drug products to market them in the same color, size, and shape as the corresponding trademarked product. This practice covers tablets, capsules, two-tone capsules and various shapes thereof. The practice is desirable to facilitate identification of a particular medication of a particular strength by the pharmacist and the physician. Standardization of color, size and shape is also important to ensure that the proper pharmaceutical product is dispensed. In addition, standardization is highly desirable in emergency situations, where the color, size and shape provide rapid identification of the product to which a patient has overdosed. Standardization of color, size, and shape is also useful to enable a patient to advise a physician regarding the medication the patient has taken previously by describing the color, size, and shape.

. . . . .

Confusion would result in the medical field [if Premo were required to alter the appearance of its generic product] inasmuch as a physician would have great difficulty identifying Premo's generic triamterene-hydrochlorothiazide by its appearance. I believe it is exceptionally important that all drug products of the same ingredients and strengths have the same color, size, and shape so that there is a standard means of identifying the drug product.

Stemple's affidavit makes no mention of the fact that the industry practice was oth-

er than that which he described as exceptionally important.[3] Moreover, his quoted concern about confusion in emergencies is inconsistent with a later part of the same affidavit, where he stated

Exhibits 2(c) through (f) are several branded drug products manufactured by leading pharmaceutical companies which are sold in the form of deep red and white or maroon and white capsules. The following is a listing of the third-party drug products included in Exhibit 2 and their manufacturers:

| Exhibit No. | Product | Manufacturer's Name |
|---|---|---|
| 2(c) | SERAX (30 mg.) | Wyeth Laboratories |
| 2(d) | DURICEF (500 mg.) | Mead Johnson & Company |
| 2(e) | HEPTUNA PLUS | Roerig |
| 2(f) | EXTRA-STRENGTH TYLENOL | McNeil Laboratories |

None of the drugs referred to is a diuretic, and thus none would be likely to be passed off as DYAZIDE. But the similarity in appearance to which Stemple refers tends, at least, to cast doubt upon the validity of his concern about drug identification in emergency situations. SKF presented two affidavits that also cast doubt on the importance of identical form and color for emergency room identification. Dr. Ralph M. Meyerson and Dr. Philip Tannenbaum both swore that color and form of a drug would never be relied upon as the sole means of identification in an overdose situation.

In addition to the Stemple affidavit, Premo presented the affidavit of Dr. Nathaniel Shafer, a physician. He swore that it was medically important that prescription drugs sold generically be marketed in the same colors and shape of the brand name drug. He stated in his affidavit:

If a patient is to be switched from SK&F's Dyazide to the less expensive generic triamterene-hydrochlorothiazide, in my opinion, the patient will feel confident that there is no change being made

---

**3.** The parties conceded at the argument on the application for preliminary injunctive relief that although an exhibit could be devised showing numerous examples of generics that have adopted the form and appearance of the branded drugs, an exhibit of a like number of dissimilar generics could be prepared as easily.

in the chemistry of the medication if the generic drug is in the same size, shape and color as the branded Dyazide. This will eliminate the serious problem of renewed and possibly increased anxiety.

In my opinion, many patients who have been using Dyazide on an extended basis would become uneasy, confused and react adversely if they received a renewal of their prescriptions with a different colored or shaped medication, even though the medication is completely identical. This could hamper the therapeutic effectiveness of the generic medication.

The Shafer affidavit makes no reference, however, to the requirement in the law of most states which permit generic substitution that the purchaser be notified of that substitution. Assuming compliance with those laws it is difficult to credit the assertion that a difference in color would increase the patient's anxiety, because the patient will be informed of the substitution and will usually have the right to refuse to accept the generic. The district court apparently chose not to credit the assertion of the Shafer affidavit, crediting instead the affidavits of Drs. Meyerson and Tannenbaum that in their experience the appearance of a drug bears no established relationship to its therapeutic efficacy.

While the Shafer affidavit also suggested the dubious medical need of emergency room identification for Premo's copying of DYAZIDE's color combination, the affidavit of Walter Epler, also submitted by Premo, which the district court did credit, pointed in quite a different direction. While the Stemple and Shafer affidavits tend to show that the intended purpose of copying the DYAZIDE color scheme was to identify the Premo product with SKF's identical product DYAZIDE in the mind of the patient, the medical profession, and the pharmaceutical trade, Epler's affidavit states that the products are not in fact identical. While the active chemical ingredients are the same, the Premo product

introduces greater quantities of those ingredients into the bloodstream per unit dosage; that is, the Premo product has a higher bioavailability than the SKF product. This suggests the likelihood that the dosage response relationship in a patient who has been using DYAZIDE over the years will change when the same dosage of the Premo product is substituted.[4]

Attached to the Stemple affidavit as exhibits are actual samples of the SKF and Premo capsules, as well as capsules of medication other than diuretics that are similar in appearance. These were offered to establish that because the SKF product bears a DYAZIDE logo while the Premo product bears a PREMO logo there is no danger of one being passed off as the other. The Dibble affidavit, however, discloses that in a survey of 234 patients for whom DYAZIDE had been prescribed, 36 patients, or 15 per cent, were unable to read the logos on their capsules. Most of those unable to read the marks were over 50 years old. The district court, examining the capsules, specifically found that the logos were so small that they would be ineffective to prevent confusion as to source or passing off. We have also examined them, and conclude that the district court's finding is not clearly erroneous. Indeed an opposite conclusion well might be, for to our over-fifty eyes the logos are decipherable only with great difficulty.

Summarizing Premo's factual contentions, then, its position is that it copied the color combination for the purpose of identifying its product as the functional equivalent of DYAZIDE, although at least with respect to bioavailability the products are not functionally identical. As with its position on patent infringement, its position on unfair competition is primarily legal. Premo argues that copying the DYAZIDE capsule is not a violation of any law, state or federal.

---

4. On February 1, 1980, the Food and Drug Administration directed Premo to recall its DYAZIDE copy because bioavailability study protocols indicate that the Premo product possesses a sevenfold greater bioavailability compared with DYAZIDE. This difference, the FDA stated, could cause a toxic buildup of potassium.

## II.

### A. New Jersey Law of Unfair Competition

■ Both parties assume, and we agree, that New Jersey law is the appropriate reference for the state law unfair competition claim alleged in Count II. Under that law there are two relevant torts of unfair competition, passing off one's goods or services as those of another, and unprivileged imitation. *E. g., Squeezit Corp. v. Plastic Dispensers, Inc.*, 31 N.J.Super. 217, 221–22, 106 A.2d 322, 325 (App.Div.1954); *French Amer. Reeds Mfg. Co. v. Park Plastics Co.*, 20 N.J.Super. 325, 329, 90 A.2d 50, 52 (App. Div.1952) (quoting Restatement); *Press Pub. Co. v. Atlantic County Advert., Inc.*, 108 N.J.Super. 75, 81, 260 A.2d 6, 9 (Ch.Div. 1969), *aff'd*, 59 N.J. 356, 283 A.2d 102 (1971); *see Smith, Kline & French Labs. v. Clark & Clark*, 157 F.2d 725, 730–31 (3d Cir.), *cert. denied*, 329 U.S. 796, 67 S.Ct. 482, 91 L.Ed. 681 (1946); *Columbia Broadcasting Sys., Inc. v. Melody Recordings, Inc.*, 134 N.J.Super. 368, 341 A.2d 348, 352 (App.Div. 1975). The New Jersey cases define these two torts in roughly the same manner as did the First Restatement of Torts. The Restatement formulation is

[o]ne who

(a) fraudulently markets his goods or services as those of another, or

. . . . .

(c) markets goods with an unprivileged imitation of the physical appearance of another's goods is liable to the other for the relief appropriate under [the ensuing Restatement rules with regard to calculation of damages].

Restatement of Torts § 711 (1938). The section 711(a) tort of passing off is further defined in section 713:

One fraudulently markets his goods as those of another if, though making no misrepresentation himself, he intentionally induces his purchasers so to market them.

In illustration of section 713 the Restatement uses this example, derived from the Supreme Court case of *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924):

A manufactures a compound of cocoa and quinine for sale. B also manufactures a compound of cocoa and quinine and urges druggists to buy this product, which he offers at a lesser price, and to sell it for A's compound when that is called for by customers. B is subject to liability to A.

Restatement of Torts § 713, Illustration 1 (1938). Moreover, it has been held that it is actionable conduct under New Jersey law for a drug manufacturer to put a product in the hands of a pharmacist in a form in which the manufacturer can reasonably anticipate that it may be passed off as another product even if the manufacturer does nothing else to · encourage passing off. *Merrell-National Labs., Inc. v. Zenith Labs., Inc.*, 194 U.S.P.Q. 157, 159–60 (D.N.J.1977), *aff'd*, 579 F.2d 786 (3d Cir. 1978); *see Ives Labs., Inc. v. Darby Drug Co.*, 601 F.2d 631, 641 (2d Cir. 1979). The law in other states is similar in this respect. *E. g., Pennwalt Corp. v. Zenith Labs., Inc.*, 472 F.Supp. 413, 418–19 (E.D.Mich.1979) (Michigan law; finding likelihood of establishing unfair competition without evidence of direct passing off); *Norwich Pharmacal Co. v. Sterling Drug, Inc.*, 271 F.2d 569, 570 (2d Cir. 1959) (applying New York law), *cert. denied*, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); *see Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 384 (7th Cir.) (placing means of deception in another's hands is actionable under Lanham Act), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Stewart Paint Mfg. Co. v. United Hardware Distrib. Co.*, 253 F.2d 568, 575 (8th Cir. 1958) (same); *Stix Prod., Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 496 (S.D.N.Y.1968) (same).

The section 711(c) tort of unprivileged imitation is defined in section 741 of the Restatement as:

One who markets goods, the physical appearance of which is a copy or imitation of the physical appearance of the goods of which another is the initial distributor, markets them with an unprivileged imitation, under the rule stated in

§ 711, if his goods are of the same class as those of the other and are sold in a market in which the other's interest is protected, and

.    .    .    .    .

(b) the copied or imitated feature has acquired generally in the market a special significance identifying the other's goods, and

(i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and

(ii) the copied or imitated feature is nonfunctional, or, if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other.

In the New Jersey case law the elements of the section 741 protection are generally expressed as conjunctive requirements of secondary meaning and nonfunctionality. *E. g., Squeezit Corp. v. Plastic Dispensers, Inc.,* 31 N.J.Super. at 221–22, 106 A.2d at 325; *French Amer. Reeds Mfg. Co. v. Park Plastics Co.,* 20 N.J.Super. at 330–31, 90 A.2d at 54–55. Section 742 of the First Restatement of Torts defines functionality:

A feature of the the goods is functional, under the rule stated in 741, if it affects their purpose, action or performance, or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects.

The Comment accompanying that section observes further that

[a] feature is non-functional if, when omitted, nothing of substantial value in the goods is lost. A feature which merely associates goods with a particular source may be, like a trade-mark or trade name, a substantial factor in increasing the marketability of the goods. But if that is the entire significance of the feature, it is non-functional; for its value then lies only in the demand for goods associated with a particular source rather than for goods of a particular design.

Restatement of Torts § 742, Comment a (1938). Proof of nonfunctionality generally requires a showing that the element of the product serves no purpose other than identification. In the case of a drug, for example, the allegedly nonfunctional element must not enhance efficacy. *See William R. Warner & Co. v. Eli Lilly & Co.,* 265 U.S. at 529, 44 S.Ct. at 617 (chocolate flavoring that gave distinctive flavor and color also acted as suspension medium, thus enhancing efficacy); *Norwich Pharmacal Co. v. Sterling Drug, Inc.,* 271 F.2d at 572 (pink color of Pepto-Bismol may have functioned to soothe patient's suffering).

The record in this case made at the hearing on the motion for a preliminary injunction warranted a conclusion by the district court that SKF would be likely to succeed at final hearing in establishing that Premo committed both the tort of passing off and the tort of unprivileged imitation.

As to passing off, it is undisputed that the maroon and white color scheme of a virtually identical capsule container was adopted by Premo with the intention of associating its product, in the minds of users, physicians, and pharmacists, with DYAZIDE. It is nowhere suggested that Premo was unaware of the practice by some unscrupulous pharmacists of substituting less expensive generic drugs for the brand name drugs prescribed without informing their customers and without passing along the benefit of the lower price. It was reasonable for the district court to conclude that Premo's use of a practically identical trade dress would facilitate such passing off. The record shows, further, that in the short time that the Premo product was on the market an abbreviated survey established four instances of illegal undisclosed substitution.

As to unprivileged imitation, Premo contends that the record does not support the establishment of secondary meaning, while it does show that the color scheme is functional. Premo's own submissions tend to support the strong showing made by SKF that in the diuretic market the maroon and white color scheme is associated with DYAZIDE. That association by patients and

physicians is the very reason given for the imitation in the affidavits of Stemple and Shafer submitted by Premo. The record shows that DYAZIDE is the only oral diuretic marketed in a maroon and white No. 3 hard gelatin capsule, and that it has been extensively advertised to the medical and pharmaceutical professions in that form. The adoption of that trade dress was arbitrary, having nothing to do with the purpose or performance of the drug, or with its processing. The only value of the trade dress was in identifying the goods with their source, and that value suffices in the New Jersey courts to establish secondary meaning. Premo argues in response that no one can acquire a protectable secondary meaning in a color. As long ago as 1899, however, Justice Holmes gave the appropriate response to that contention when he wrote,

It is true that a man cannot appropriate a geographical name; but neither can he a color, or any part of the English language, or even a proper name to the exclusion of others whose names are like his. Yet a color in connection with a sufficiently complex combination of other things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunction line.

*American Waltham Watch Co. v. United States Watch Co.,* 173 Mass. 85, 87, 53 N.E. 141, 142 (1899).

■ Premo attempted, through the Stemple and Shafer affidavits, to persuade the trial court that the bi-colored capsule was functional. There is no question but that shape and color of a product may, under New Jersey law, be so related to the product's intended use as to be functional and thus unprotectable. The catsup dispenser in the shape and color of a tomato, *Squeezit Corp. v. Plastic Dispensers, Inc.,* 31 N.J.Super. 217, 222, 106 A.2d 322, 326 (App. Div.1954), and the traditional shape of a ukelele, *French Amer. Reeds Mfg. Co. v. Park Plastics Co.,* 20 N.J.Super. 325, 90 A.2d 50 (App.Div.1952), are the classic examples in New Jersey. But in this case even the identical diuretic drug combination is suc-

cessfully marketed in an orange tablet form, and there is ample evidence that neither the capsule form nor the color combination reflects any industry practice for the identifications of diuretics.

Premo urges, however, that even if the district court was correct in concluding that SKF would be likely to succeed at final hearing in establishing either passing off or unprivileged imitation under New Jersey law, the district court nevertheless should have denied relief because relief for those New Jersey torts has been foreclosed by the Supreme Court's decisions in *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). Those cases establish that state laws of unfair competition must accommodate to the federal policies favoring competition embodied in the patent laws. They hold that a state may not impose liability upon a competitor for copying an unpatented product and thereby grant a perpetual state-protected design patent. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. at 231–32, 84 S.Ct. at 788–89; *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. at 237–38, 84 S.Ct. at 781–82. But the Court was careful to leave undisturbed state laws protecting against passing off and unprivileged copying of nonfunctional elements of trade dress. In *Sears* the Court wrote:

Doubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source, just as it may protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods.

376 U.S. at 232, 84 S.Ct. at 789 (footnote omitted). The continued viability of the state law of unfair competition has been reconfirmed by the Court since the opinions in *Sears* and *Compco. See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 478–79, 94

S.Ct. 1879, 1884–1885, 40 L.Ed.2d 315 (1974) (state law can grant perpetual protection of trade secrets); *Goldstein v. California*, 412 U.S. 546, 571, 93 S.Ct. 2303, 2317, 37 L.Ed.2d 163 (1973) (state law can protect against the copying of an uncopyrighted performance). *See also Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576–77, 97 S.Ct. 2849, 2857–2858, 53 L.Ed.2d 965 (1977) (state law can protect right of publicity in uncopyrighted performance). Thus we agree with the conclusion reached by the Second and Eighth Circuits that the state law tort of unprivileged imitation survives *Sears* and *Compco*. *See Ives Labs., Inc. v. Darby Drug Co.*, 601 F.2d 631, 642 (2d Cir. 1979) (*Sears* and *Compco* limited to precluding state unfair competition laws from granting patent-like protection to unpatented products); *Truck Equipment Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1214–15 (8th Cir.) (relying on distinctive purposes to be served by federal patent laws and state unfair competition laws), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

The district court did not err, therefore, in concluding that SKF would be likely to succeed at final hearing in establishing Premo's violation of its rights as protected by state law.

### B. Federal Law of Unfair Competition

The federal law of unfair competition is not significantly different, as it bears upon this case, from that of New Jersey. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in relevant part that

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

It is well established that section 43(a) proscribes not only acts that would technically qualify as trademark infringement, but also unfair competitive practices involving actual or potential deception. *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649, 650–51 (3d Cir. 1954); *see Ives Labs., Inc. v. Darby Drug Co.*, 601 F.2d at 641–42 (§ 43(a) creates federal statutory torts of unfair competition beyond simple trademark infringement); *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir. 1977) (§ 43(a) standing to sue extends beyond trademark owner to other injured parties); *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 236 (2d Cir. 1974) (§ 43(a) extends rights to parties injured by false advertising). The statute on its face proscribes passing off, as does New Jersey law, but it has been construed more broadly to proscribe other competitive torts, including those defined in the First Restatement of Torts. Judge Hastie's opinion in *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir. 1954), a leading case so construing section 43(a), for example, holds that the Lanham Act reflects the expansive viewpoint of section 761 of the Restatement. *Id.* at 651. Certainly the Act is broad enough to include the tort of unprivileged imitation, the imitation of any nonfunctional physical details of a competitor's product that have acquired a secondary meaning. *Ives Labs., Inc. v. Darby Drug Co.*, 601 F.2d at 642; *Truck Equipment Serv. Co. v. Fruehauf Corp.*, 536 F.2d at 1215; *see In Re Mogen David Wine Corp.*, 328 F.2d 925, 929 (C.C.P.A.1964) (setting forth secondary meaning and nonfunctionality test). On the facts of this case we perceive no essential difference between the formulation of the tort of unprivileged imitation relied on by the New Jersey courts and First Restatement of Torts and the acts proscribed by section 43(a) of the Lanham Act except for the Lanham Act's required element of interstate commerce, which is not here in dispute. Moreover there is no suggestion in the *Sears* and *Compco* cases that federal patent policy somehow limited the scope of section 43(a), for the Court had no need in those cases to address the reach

of a federal tort over which Congress has complete control.

Since, except for the interstate commerce requirement, the elements of the unfair competition torts proscribed by New Jersey law and by section 43(a) of the Lanham Act are the same, we need not repeat the factual discussion as to likelihood of success on the merits of the federal cause of action. The district court could properly find that SKF had a strong likelihood of success on the merits of its Lanham Act claim.

### III.

■ Premo also urges that even assuming SKF's likelihood of success on the merits at final hearing, the district court in this instance abused its discretion in granting a preliminary injunction by failing to give proper consideration to other elements bearing on the propriety of that relief. Premo complains that there was no proof of irreparable injury to SKF pending final hearing on the merits, an improper balance of countervailing equities in its favor, and a disregard of the public interest. Before turning to our consideration of these arguments, however, we make the preliminary observation that the scope of our review of a trial court's discretionary ruling on an application for preliminary injunctive relief is narrow.

> Unless the trial court abuses [its] discretion, commits an obvious error in applying the law, or makes a serious mistake in considering the proof, the appellate court must take the judgment of the trial court as presumptively correct.

*A. O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976). Moreover, the burden on an appellant seeking reversal of a trial court's determination on an application for a preliminary injunction is a heavy one. *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975); *Scooper Dooper, Inc. v. Kraftco Corp.,* 460 F.2d 1204, 1205 (3d Cir. 1972) (per curiam). Our cases require that SKF make a showing of a reasonable probability, not the certainty, of success on the merits. *Oburn v. Shapp,* 521 F.2d at 148. A somewhat similar standard applies in New Jersey for pendente lite injunctive relief against unfair competition on state law grounds. *General*

*Elec. Co. v. Gem Vacuum Stores, Inc.,* 36 N.J.Super. 234, 236–37, 115 A.2d 626, 627 (App.Div.1955). We have already held that on both the Lanham Act count and the state unfair competition count, SKF made the required showing of likelihood of ultimate success. We turn now to the remaining elements required for the grant of preliminary injunctive relief.

### A. Irreparable Harm

SKF advanced two arguments in support of its claim that it would be injured irreparably if Premo is permitted to continue imitating the appearance of its DYAZIDE capsules pending final hearing. The first argument was that Premo would be financially unable to respond in damages for its unlawful usurpation of DYAZIDE's trade dress in the intervening sale of millions of Premo capsules, and that the court could not realistically fix the appropriate amount of a surety bond or escrow to secure such recovery. The second argument was that SKF's reputation would be irreparably injured by the substitution of Premo's product for DYAZIDE because, as the Epler affidavit establishes, the two products are not bioequivalents. Unknowing or willful substitution even if legally permissible would expose SKF not only to the risk of patient and physician dissatisfaction if the patient reacted to the substitute drug differently, but also to the risk of suit for the resulting consequences. In such a suit the striking similarity in appearance of the two products would make it unlikely that SKF, the deep pocket defendant, could prove that the harm was caused instead by Premo capsules, because the only proof as to the source would be the capsules themselves, long since digested by the patient. The trial court did not rely explicitly on the first ground, but on the second concluded that SKF had made a sufficient showing of the likelihood of irreparable harm to it in the absence of a preliminary injunction. On the record before us, we find that the district court judge did not abuse his discretion in so concluding.

### B. The Balance of Equity

The record on which the district court acted is almost totally devoid of equities

favoring Premo. It undertook the manufacture and sale of a patented product while the patent, never successfully challenged, still prohibited such activity. In the course of this undertaking, Premo could have chosen a dosage form other than powder contained in a gelatin capsule. Even if it chose a powder and capsule dosage form, a vast number of single or bi-color capsule combinations other than those chosen were available for selection. In light of these factors, Premo's implausible suggestion that the choice of a maroon and white gelatin capsule was made for functional reasons was not credited by the trial court. Even now it is not enjoined from marketing the combination drug covered by the expired SKF patent in a dosage form different from DYAZIDE. The only answer that Premo made when confronted with these factors was, in essence, that it could compete more effectively in the diuretic market if it could use the same maroon and white capsule color adopted by SKF for DYAZIDE. Probably it could compete better still if it could appropriate the same trade name. But neither appropriation has the look, sound or feel of equity. Therefore, the trial court did not err in concluding that the competing equities favored preliminary injunctive relief for SKF.

C. The Public Interest

Finally, both Premo and the Justice Department, as amicus curiae, urge that the general federal policy of favoring competition, and the particular state policies favoring competition in the prescription drug industry reflected in the now common generic drug substitution laws, must be taken into account. They urge that these pro-competitive public policies demand the conclusion that generic drug manufacturers should be free to copy the form and appearance of the most popular brand name prescription products. Although we accept the pro-competitive public policy premise, we do not reach the same unfair competition conclusion. The public policy of both the United States and New Jersey favors free and open competition. But Congress in section 43(a) of the Lanham Act and New Jersey in its common law of unfair competition have recognized that certain kinds of business

activity, while promoting competition in the short run, are in the long run apt to be destructive of competition. The adoption of a distinctive trade dress as a means of identifying a product with its source is a legitimate means for the promotion of the user's business, and permitting piracy of that identifying trade dress can only discourage other manufacturers from making a similar individual promotional effort. Moreover allowing a manufacturer to be able to acquire and maintain a reputation for consistent good quality is certainly pro-competitive. Permitting a business climate in which substitutions of products over which the first manufacturer has no quality control in the long run can only discourage the effort to compete on the basis of reputation for quality. But even if the Lanham Act and the New Jersey law of unfair competition were not in the long range interests of competition, preventing deception of the public is itself in the public interest. The public interest is not something that courts and judges can know by feeling vibrations from the cosmos. Rather, it is reflected in the law of some appropriate sovereignty. In this case the public policies embodied in the Lanham Act and in the New Jersey common law of unfair competition are both parallel and consistent. Neither offends the federal antitrust laws, for those laws have never been held to require toleration of acts or practices presently or potentially deceptive. Thus we reject Premo's contention that it would be somehow in the public interest to permit it either to facilitate passing off or to appropriate a nonfunctional trade dress that has acquired a secondary meaning in the identification of SKF's product.

There is, moreover, another element of the public interest on which the trial court relied. That element is the patient's interest in protection from both inadvertent confusion and deliberate illegal substitution of a product which by Premo's own affidavits is conceded to be different from DYAZIDE in terms of bioavailability. Certainly the district court cannot be said to have abused its discretion in considering this aspect of the public interest to be a highly significant factor favoring pendente lite relief.

We hold, therefore, that the trial court did not abuse its discretion in concluding that the public interest favored the grant of a preliminary injunction.

## IV.

The record on which the trial court acted in granting a preliminary injunction establishes the likelihood of ultimate success on the merits and the probability of irreparable injury in the absence of a temporary injunction. The court appropriately balanced the equities between the parties, and properly took into account appropriate concerns in considering the public interest. The order appealed from will be affirmed.