**SMITHKLINE BECKMAN CORP. and Menley & James Laboratories, Ltd.**

v.

**PENNEX PRODUCTS COMPANY, INC.**

v.

**PEOPLES DRUG STORES, INC., Revco D.S., Inc., Rite Aid Corp., Consumer Value Stores, a division of/and Melville Corporation, and Gray Drug Fair Stores, Inc., Third Party Defendants.**

Civ. A. No. 84–0913.

United States District Court, E.D. Pennsylvania.

Feb. 21, 1985.

See also 103 F.R.D. 539.

James R. Meyer, Philadelphia, Pa., for plaintiffs.

Steven R. Trost, New York City, for Pennex Products Co., Inc.—defendants.

Stuart E. Beck, Philadelphia, Pa., for Gray Drug Fair Stores, Inc.—third party defendant.

Mark M. Wilcox, Philadelphia, Pa., for Consumer Value Stores—third party defendant.

Barry E. Ungar, Philadelphia, Pa., for Rite Aid Corp.—third party defendant.

MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

Plaintiffs, Smithkline Beckman Corporation and its wholly owned subsidiary Men-

ley and James Laboratories, Inc. (Smithkline) have filed suit against Pennex Products Company (Pennex) for trademark infringement and unfair competition claims pursuant to the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) and Pennsylvania Unfair Competition laws.[1] The matter presently before the court is defendant's motion for partial summary judgment.

## A. FACTS

As anyone who has suffered from the excruciating pain of a throbbing headache will agree, aspirin is truly a wonder drug. It is able to provide relief to a host of aches, pains, fevers and assorted ailments. As with all drugs, even those sold over the counter, there are both positive and negative aspects. Aspirin is no different. When aspirin dissolves in the stomach, its reaction with the body's chemicals can cause gastric distress. This unfortunate side effect has significantly curtailed aspirin usage among a portion of the public. Approximately six years ago, Smithkline began to market a "safety coated" aspirin product which eliminated gastric distress by dissolving in the intestines and not the stomach. The designation for this analgesic is enteric coated aspirin. Smithkline offers it for sale under the brand name ECOTRIN®. The color of the coating is a bright orange. Enteric coated aspirins have been in existence for thirty years, but it has been only recently that their use became more widespread.

Not coincidentally, the sale of all enteric coated aspirin began to increase at the same time that Smithkline launched a major promotional and marketing campaign for ECOTRIN®. In 1978, the year prior to the start of Smithkline's marketing efforts, sales were less than $3.4 million dollars. By contrast, sales figures for the latest period available (1983) shows a seven-fold increase to $24.4 million dollars. Although enteric coated aspirin is interchangeable with regular aspirin in its effects upon symptoms, Smithkline targeted its ECOT-RIN® product to the arthritis sufferer's market. The advertising, which covers both the print and electronic media, prominently identifies that ECOTRIN® is for arthritis pain sufferers. Though Smithkline is attempting to segment the aspirin market, the fact remains that ECOTRIN® must compete against both regular aspirin and other safety coated aspirins.

There is no evidence before the court to suggest that the color of the safety coating is related to its effectiveness. The product should work just as well if it were coated another color. Undoubtedly, Smithkline desired to distinguish its analgesic product from the plethora of others by providing ECOTRIN® with a distinct trade dress.

If success is said to breed imitation, then to the business person imitation is the highest form of flattery. Pennex is a pharmaceutical manufacturer who produces enteric coated aspirins for approximately twenty private labels or house brands. The safety coating on their aspirin is also orange.

Private label brands owe their existence to the advertising and promotion efforts of the national brand. The national brand will expend tremendous sources of funds to build consumer recognition of both its product and tradename. If successful, the results should show higher market penetration and increased sales. The store brand plays upon increased consumer awareness by placing its own product in close proximity to the nationally advertised brand. Local advertising by the store will invite comparisons between its private label product and the nationally advertised one. Inevitably, the private label will be substantially less expensive than the nationally advertised product.

Smithkline seeks to halt what it terms as defendants' unprivileged imitation of its product, a distinctive orange tablet. There are three counts to the complaint. Count I charges Pennex with imitating the packaging of their product. Count II of the complaint sets forth claims against

---

1. The law of Pennsylvania with respect to unfair competition is identical to federal law except for the federal requirement that the products move in interstate commerce.

Pennex for false designation of source or false representation (unfair competition) within the meaning of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count III of the complaint charges Pennex with trademark infringement within the meaning of § 32 of the Lanham Act 15 U.S.C. § 1114. The same legal standards are employed to determine violations under unfair competition claims as well as trademark infringement.

> In many factual situations, the same result is reached whether the legal wrong is called trademark infringement or unfair competition. In such cases the courts often lump them together and speak of them as identical concepts (footnote omitted) ... Whatever route one travels, whether by trademark infringement or unfair competition, the signs give direction to the same inquiry— whether defendants' acts are likely to cause confusion. (footnote omitted).

J. McCarthy, Trademarks and Unfair Competition, § 2.3 (2nd edition, 1984).

The court will discuss the issues *seriatim.*

## B. DISCUSSION

The purpose of a motion for summary judgment is to test the merits of the action and determine prior to trial whether the parties have a basis for relief or defense. It is hornbook law that such a motion is not a substitute for trial. If the record, when examined in the light most favorable to the non-moving party, shows any material facts or inferences that are in dispute, the motion should be denied. Fed.R.Civ.P. 56, *Swettlen v. Wagoner Gas & Oil, Inc.,* 369 F.Supp. 893 (W.D.Pa.1974); 6 Moore's Federal Practice § 56.15.

### 1. Smithkline's Trademark Infringement Claims.

The issue of trademark infringement is but one aspect of the broader field of unfair competition. *Villager, Inc. v. Dial Shoe Company,* 256 F.Supp. 694, 703 (E.D.Pa.1966). Since trademark infringement is a narrower concept, any finding that it has occurred will, by necessity, support an additional finding that the defendant is also guilty of unfair competition. The reverse, however, is not true. Evidence may be adduced to show that the defendant has simulated an aspect of plaintiff's product sufficient to deceive the consumer without a finding that such action has infringed a trademark.

Section 45 of the Lanham Act, 15 U.S.C. § 1127 provides the basic definitions for trademark laws. A trademark may be any mark, name, symbol, device, or any combination thereof which is adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others. A symbol may rise to the level of a protectable trademark in one of two ways. The mark can be registered or its continued use can establish a "secondary meaning" in the consumer's mind. To establish secondary meaning the manufacturer must show that in the minds of the public the primary significance of a product feature or term is to identify the source of the product rather than the product itself. *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 152 (3d Cir.1984) (quoting from *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2186 n. 11, 72 L.Ed.2d 606 (1982).

Smithkline believes that the defendant's motion for summary judgment is inappropriate until it has the opportunity to show that ECOTRIN's® bright orange tablet has acquired a secondary meaning. Pennex characterizes the issue differently by asserting that, as a matter of law, even if Smithkline were to show secondary meaning, a color per se may not act as a trademark.

The Third-Circuit in *Campbell Soup Co. v. Armour & Co.,* 175 F.2d 795 (3d Cir. 1949), *cert. denied,* 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518 (1949), addressed this very issue by holding that a party may not acquire a trademark by color alone, but only if the color is used in combination with a design in the form of the product. The Campbell soup decision drew its legal rea-

soning from *Diamond Match Co. v. Saginaw Match Co.*, 142 Fed. 727 (6th Cir. 1906), *cert. denied*, 203 U.S. 589, 27 S.Ct. 776, 51 L.Ed. 330 (1908). There the court said, "[s]ometimes a color, taken in connection with other characteristics, may serve to distinguish one's goods, and thus be protected by the courts ...; but as a rule, a color cannot be monopolized to distinguish a product ...". *Id.* at 729.

The sound reasoning behind the formation of this rule is basic. There are only a limited number of colors available and it would be impractical to allow proprietary rights in such an essential symbol as color to accrue in a limited group.

Three instances where color, in combination with other characteristics of the product, was held protectable is illustrative of the principle. In *Ideal Toy Corp. v. Plawner Toy Mfg.*, 685 F.2d 78 (3d Cir. 1982) the court extended trademark protection to the distributors of the "Rubik's Cube" puzzle. The cube is six sided and composed of 26 smaller cubes. When the puzzle is solved the cube's six sides will each represent a different color—red, blue, green, yellow, orange and white. The puzzle was identifiable on sight and referred to by all as a "Rubik's Cube". Defendant brought its cube puzzle on the market as the "Wonderful Puzzler". It was identical in all respects to Ideal's. The lower court enjoined the defendant from offering its toy for sale. The court of appeals upheld the ruling finding that sufficient evidence was presented to show that secondary meaning had attached to the Rubik's Cube trade dress. *Id.* at 82.

Colored capsules of prescription drugs have also received trademark protection. *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055 (3d Cir. 1980) (Maroon and white color of a prescription drug capsule was protectable trade dress). And in *Artus Corp. v. Nordic Co., Inc.*, 512 F.Supp. 1184 (W.D.Pa. 1981) the defendant was found to have infringed plaintiff's rights by color coding his gaskets identically to plaintiff's. Artus Corp. for 25 years had color coded its gaskets to designate thickness. The colors were found to be a non-functional feature which had developed secondary meaning in the minds of its customers over that period of time. *Id.* at 1188.

■ These cases show that in very limited circumstances color, as a non-functional characteristic, can achieve a secondary meaning. The court cannot say as a matter of law, that even if Smithkline proved secondary meaning, its product could not receive protection.

■ The law is clear that it is not enough for plaintiffs to show simply that their orange tablet has achieved secondary meaning. They must also demonstrate that there exists a likelihood of confusion in the minds of the public over the source of the orange tablet. *Freixenet, S.A. v. Admiral Wine & Liquor Co., supra*, 153; *SK & F v. Premo, supra*, 1066; *Artus Corp. v. Nordic Co., Inc., supra*, 1191; *LeBow Bros., Inc. v. LeBole Euroconf. S.p.A.*, 503 F.Supp. 209, 210 (E.D.Pa.1980); *Surgical Supply Service, Inc. v. Adler*, 321 F.2d 536 (3d Cir.1963). If the mark, however, is not visible at the time of purchase, can the consumer be confused since the decision to purchase is based upon some aspect other than the mark? Smithkline believes the answer is yes. There is a nexus between secondary meaning and the likelihood of confusion. Recognition and association are the cornerstones of secondary meaning. As more of the populace associates a particular mark with the source of the goods, the more likely it is that confusion may abound if a second identical mark is introduced. "The stronger the evidence of secondary meaning, the stronger the mark, and the more likely is confusion." *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 (9th Cir.1980). A brief comparison of the packages the consumer sees at the time of purchase will be helpful in deciding this issue.

Plaintiff's ECOTRIN® tablets are contained in a white non-translucent plastic bottle. The bottle is packaged in a box. The tradename ECOTRIN® is prominently displayed on the box. The "i" in ECOT-

RIN® is dotted by the orange tablet. The color motif of the box is white, green, and orange. It is a very bright and distinctive package. In addition to the brand name, the phrases "safety-coated aspirin" and "for arthritis pain" appear on the package. The color and copy seen on the package are carried over to the label placed on the bottle. This total image of the ECOTRIN® product is its "trade dress". Although defendant Pennex manufactures enteric coated aspirin for over 20 private label brands, the partial summary judgment motion involves only two of those brands, Consumer Value Stores (CVS) and AARP Pharmacy Service (AARP). The CVS aspirins are housed in a nontranslucent plastic white bottle which is packaged in a box. The color scheme of the box is primarily white with blue, gold and black lettering. CVS does not use a brandname to market its product. The CVS letters are prominently displayed and the product is referred to as enteric coated aspirin (a generic designation). CVS does not depict the aspirin on its package. There is no reference to the color of the aspirin and the package is sealed. The layout on the box is carried over to the label. Again, no indication of the color of the aspirin is present. The AARP enteric coated aspirin is contained in a translucent plastic bottle. The orange colored aspirins are clearly visible through the bottle. AARP does not use a brandname, but lists the product only as special coated aspirin for arthritis. The color motif is black and blue. The consumer who sees the CVS package is ignorant of its contents unless he or she has previously purchased the product. There is no similarity between the ECOTRIN® package and the CVS package. They are visually different and bear no resemblance to one another in any manner. Pennex concludes that this precludes a finding that the consumer can be confused even if Smithkline established secondary meaning in its product. Smithkline disagrees and contends that the court should not limit the inquiry to confusion to the time of purchase, but instead should examine what effect post-purchase confusion has on the consumer. This expansive view, they say, is necessitat-ed by the emerging retail practice of "generic brands". Smithkline asserts that Pennex's imitation of ECOTRIN's® trade dress is related to the subtle aspects of consumer psychology in formulating purchase decision. The popularity of the housebrand or generic aspirin is attributable to the wide-spread perception among consumers that the housebrands are manufactured by the same company as the "national brand" (ECOTRIN®). This false assumption is reinforced by the retailing methods of the store. Its advertisements ask the shopper to compare "theirs" to "ours". The store will place the housebrand next to ECOTRIN®. The consumer, upon opening the bottle, is further reinforced by the similarity of the product. And, the housebrand is always substantially less costly which undoubtedly is a factor underlying the consumer's selection. Under Smithkline's theory, it is not any one factor which holds balance but the combination of retailing practices, trade dress and consumer ignorance which culminate in creating an illusory image that will affect *subsequent purchases* by the consumer. In essence, Smithkline believes that the seed of unfairness is sown at the point of purchase, even though the consumer may not have labored under any false assumption at that time, but developed it at a later point. I believe this theory is too tenuous and the inquiry into the likelihood of confusion should center on confusion at the time of purchase. *See Schmidt Manufacturing Co. of S.C. v. Sherrill Industries, Inc.*, 249 F.Supp. 480 (W.D.N.C.1965) (confusion must occur at time of purchase and relate to that being purchased); *R.M. Smith, Inc. v. Collins, Ltd.*, 219 U.S.P.Q. 465 (W.D.Pa.1983) (critical issue is can consumer distinguish the source of the product at the point of purchase).

The "subtle psychological" factors which defendants employ are not inherently illegal and no allegations by plaintiff have been made to the contrary. The gravamen of plaintiff's argument seems to be based more on competition than on unfairness. Advertisements which compare "theirs" to "ours" are common place in the retail field. Placing the enteric coated aspirin in close

proximity to ECOTRIN® highlights the housebrand product, but that is not unfair, only competitive. Lastly, store employees who urge consumers to try or use the store brand product are certainly within their rights so long as there is no attempt to deceive the public as to the source of the goods. The characteristic that all the unfair competition claims share is that confusion is the direct and proximate result of an act undertaken by the defendant. Under Smithkline's theory, confusion which is not created by the defendants, but only reinforced by them, would be consequential in determining a claim. This theory is so broad it would penalize a defendant for selling to a customer who believed all generic products come from a national brand manufacturer prior to ever having purchased Pennex's product. It would also hold defendants accountable for confusion associated with consumers who believe that the housebrand and ECOTRIN® were manufactured by different companies, but subsequent to using Pennex's product, developed a belief to the contrary. Such a far ranging inquiry serves no function to the underlying purpose of the law particularly in light of the fact that the plaintiffs are not required to prove actual confusion, only the likelihood of confusion. *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1360 (E.D.Pa.1972) (Becker, J.); *aff'd without opinion*, 480 F.2d 917 (3d Cir.1973). There is no reason to doubt plaintiffs when they assert that confusion and ignorance abound over the source and composition of "generic products", but it is only that confusion which is the direct result of defendants' acts that concerns the law of unfair competition. The inquiry into the likelihood of confusion is directed towards the time of purchase. Post-purchase confusion which is not the direct consequence of defendants' action is not a factor. Secondary meaning is but an indicia of reliability that confusion may exist. However, it is not a substitute for proof of confusion. The consumer must have a specific product or package in mind with which to be confused. The buyer to be deceived must be looking for something specific, but chooses another

in his confusion. *Spangler Candy Co. v. Crystal Pure Candy Co.*, 235 F.Supp. 18, 28 (E.D.Ill.1964) *aff'd* 353 F.2d 641 (7th Cir.1966).

■ Defendants have cited the well-established rule of law that all combination of the features comprising the trade dress must be examined as a whole to determine whether the competing product is likely to cause confusion in the minds of the consumer. *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir.1980). As this test is applied to CVS and ECOTRIN® packages, the court finds that no likelihood of confusion exists. The CVS packaging uses different colors. The distribution source (CVS) is readily apparent. There is no indication on the package of the contents inside. The trade dress shields the product and presents so unique a picture that the consumer will not confuse ECOTRIN® with CVS.

The AARP trade dress, however, leads us to a different conclusion. The consumer can clearly see the size, shape and color of the tablets. Since the tablet is exposed to the consumer at the time the purchase decision is made, a strong inference that a likelihood of confusion exists precludes granting the summary judgment motion on the AARP product.

Smithkline argues quite articulately that if they can prove secondary meaning of a nonfunctional characteristic along with proof of intentional copying, then the inference of consumer confusion which is created obviates any argument as to the package dissimilarity. Smithkline believes the proper rule of law is articulated in the *SK & F v. Premo, supra,* and *Boehringer Ingelheim v. Pharmadyne Lab,* 532 F.Supp. 1040 (N.J.1980) decisions which held that the appearance of a pharmaceutical dosage form (size, shape, color) could constitute trade dress protectable under the law of unfair competition if it is non-functional and has acquired secondary meaning. What the court believes is distinguishable between those cases and the facts presented by the CVS "trade dress" is the difference between prescription drugs and goods available from the shelf. Prescription

drugs are a unique commodity. It is the physician, not the consumer, who selects the prescription. The drugs are repackaged by a pharmacist in clear vials which contain no easily identifiable designation of source, unique packaging or individual labeling trade dress to distinguish it. It cannot be compared side by side with another product. This is contrasted with shelf medication which can be compared side by side with similar products and comes in many unique packaging configurations which help indicate the source of the product. The decision to purchase the product is made by the consumer.

My reading of these two prescription drug cases leads me to conclude that those decisions were influenced by evidence that the generic drugs were being substituted for the brand name drug without the patient's knowledge by unscrupulous pharmacists. Since the generic drug was less costly, the pharmacists maintained the same price but yielded a greater profit.

Judge Lacey in the *Boehringer* decision said,

> This leaves open the question of what actually motivated the defendants to imitate [the drugs'] trade dress. My review of the evidence persuades me that the explanation of defendants' conduct is that such copying increase sales of their generic [drug] because unscrupulous pharmacists will buy it to pass it off profitably as [plaintiff's product].

532 F.Supp. at 1051.

Likewise, Judge Gibbons in *SK & F Premo, supra,* stated similar reasons for the court's ruling.

> It is nowhere suggested that Premo was unaware of the practice by some unscrupulous pharmacists of substituting less expensive generic drugs for the brand name drugs prescribed without informing their customers and without passing along the benefit of the lower price. It was reasonable for the district court to conclude that Premo's use of a practically identical trade dress would facilitate

such passing off. The record shows, further, that in the short time that the Premo product was on the market an abbreviated survey established four instances of illegal undisclosed substitution.

625 F.2d at 1063.

This inherently distinctive aspect of prescription drugs is simply not present in the fact pattern presented here. This is not a case where the distributor is attempting to hide its involvement. The CVS name is prominent. The unassailable difference between the packaging of a prescription drug and that of a shelf medication is the crucial element in not extending the holding in *Premo* and *Boehringer* to these facts.

Accordingly, Pennex's motion for partial summary judgment will be granted in part and denied in part. Summary judgment will be granted in favor of Pennex and CVS on counts I,[2] II and III of plaintiff's complaint. The summary judgment motion as to count I, II and III of plaintiff's complaint will be denied against Pennex and AARP Pharmacy. An appropriate order follows.

---

**2.** The facts indicate that the CVS packaging is unique and not an unprivileged imitation of the

ECOTRIN® box.