NUGGET DISTRIBUTORS COOPERATIVE OF AMERICA, INC., d/b/a Nugget Distributors, Inc., Plaintiff,

v.

MR. NUGGET, INC., Defendant.

Civ. A. No. 89–8780.

United States District Court,
E.D. Pennsylvania.

July 24, 1991.

J. Timothy Hobbs, Bruce A. McDonald, Dykema Gossett, Washington, D.C., Alan M. Black, Black, McCarty, Eidelman & Feinberg, Allentown, Pa., for plaintiff.

Stanley H. Cohen, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

HUYETT, District Judge.

This trademark infringement action arises under the Federal Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* (the "Lanham Act"), the common law of Pennsylvania, and Pennsylvania's Anti–Dilution statute, 54 Pa.Cons.Stat.Ann. § 1124 (Purdon 1986 Supp.). Plaintiff, Nugget Distribu-

tors Cooperative of America, Inc., d/b/a/ Nugget Distributors, Inc., seeks to enjoin defendant, Mr. Nugget, Inc., from using the trademark and trade name "Mr. Nugget" in the sale of food products to institutional and commercial purchasers in the food service market. Plaintiff contends that defendant's use of "Mr. Nugget" is confusingly similar to plaintiff's trademark, service mark and trade name "Nugget." There is no request for monetary relief. Plaintiff does not seek to enjoin defendant's use of the word nugget to fairly describe its products or its use of the word nugget in the retail market.

This action was tried to the court. Pursuant to Federal Rule of Civil Procedure 52, the following constitutes my findings of fact, discussion, conclusions of law, and order.

## I. *Findings of Fact*

1. Plaintiff is a non-profit Oregon corporation with its headquarters in Stockton, California. It is a national cooperative of approximately 185 companies engaged in the distribution of food products under the brand name of "Nugget." (Peralta 1/15/90, at 94.[1]) Plaintiff's members each distribute Nugget brand products. These products are purchased from suppliers who operate under licensing agreements with plaintiff. The plaintiff redistributes the proceeds of the licensing fees paid by suppliers to its cooperative members as a patronage dividend, which is based on the volume of the members' purchases. (Peralta, 1/15/90 at 135) Approximately 145 members of the cooperative distribute food items. Plaintiff distributes food items, as well as other products, in Pennsylvania through four distributors, including Ettline Foods Corporation of York, Pennsylvania, and Parkway Food Service of Greensburg, Pennsylvania (Whelan 1/15/90 at 16–62; Anderson 1/15/91 at 63–91)

2. Defendant is a Pennsylvania corporation with principal offices in Allentown, Pennsylvania, and is engaged in interstate commerce. Defendant's activity, which is the subject of plaintiff's complaint, has been conducted in part within the Eastern District of Pennsylvania. (Joint Stipulation of Facts ("JSF") Para. 3)

3. Plaintiff has more than 160 full-line food service member distributors from forty-seven states in addition to the Bahamas, Bermuda, the District of Columbia, the Netherlands Antilles, Puerto Rico, the Virgin Islands and Japan. Plaintiff's member distributors are engaged in the interstate distribution of food products, cleaning products, kitchen appliances, tableware, furniture, and related products. (JSF Para. 4)

4. The distribution of fish and fish products represents a portion of plaintiff's food service distribution business. Plaintiff's fish products include its "Batter Fri Fillet Style Portions," "Breaded Fish Portions," "Fish Cakes," "Fish–In–Batter," "Fish Portions," "Fish Portions Made From Minced Fish," "Fish Sticks," and "Fish Nuggets." (JSF Para. 5)

5. Defendant was incorporated on May 22, 1987 in the Commonwealth of Pennsylvania. Prior to that date defendant was a sole proprietorship of Dr. Alexander Brokans. (JSF Para. 7)

6. Defendant's business is conducted by the following principal officers:

(1) Dr. Alexander Brokans is defendant's President and Chairman of the Board. Dr. Brokans oversees all product and packaging purchases and is responsible for all manufacturing, scheduling, quality control, product development, and product specifications.

(2) Ms. Inese B. Ardolino, daughter of Dr. Brokans, is defendant's Secretary–Treasurer and Chief Administrative Officer. Ms. Ardolino manages the financial responsibilities of defendant, including inventory control, accounts receivable, accounts payable, transportation and delivery of product, and order processing.

(3) Mr. Ralph Ardolino, Inese Ardolino's husband, is defendant's National Sales & Marketing Manager. He is responsible for development of sales and marketing concepts. (JSF Para. 7)

---

**1.** When citing testimony and exhibits, I shall refer to the name of the witness, date of the testimony, and page number of the transcript where the testimony appears.

7. In 1987 defendant commenced an interstate commercial venture to process and market fish products under the trademark "MR. NUGGET." The products which defendant markets under the trademark "MR. NUGGET" consists of "Shrimp Nuggets," "Seafood Nuggets" and "Clam Nuggets." (JSF Para. 9)

8. The word "nugget" may be used to describe a small piece of food. (JSF Para. 10)

9. The word "nugget" is in use by entities in the retail market other than plaintiff and defendant as part of a trademark used on food products or as part of a service mark used in connection with the sale of food. (JSF Para. 11)

10. On June 4, 1987, defendant filed an application to register the mark "Mr. Nugget" and design in the United States Patent and Trademark Office. The application matured into Certificate of Registration No. 1,511,920, dated November 8, 1988, and covers the trademark "MR. NUGGET" and design for "partially cooked, frozen, lightly breaded fish and seafood." (JSF Para. 12)

11. Primarily, plaintiff's member distributors' customers consist of restaurants, hotels, schools and institutions (JSF Para. 4) (colleges, health care facilities, hospitals, nursing homes, prisons, restaurants, schools, summer camps, universities and other wholesale purchasers). (Whelan 1/15/90 at 17, 29; Anderson 1/15/90 at 65) These customers comprise the food service market, commercial and institutional purchasers who serve prepared food products to consumers who are away from their homes. (Peralta 1/15/91 at 104) The food service market also includes the deli sections of supermarkets and convenience stores (Kretzer 1/16/91 at 118–119; Peralta 1/15/91 at 104–109; Whelan 1/15/91 at 29) and facilities known as "cash-and-carry" outlets operated by distributors. Restaurant operators and other purveyors in the food service market purchase wholesale quantities of Nugget products at these outlets. (Whelan 1/15/91 at 52; Kretzer 1/16/91 at 118; Wallace 1/17/91 at 36; Peralta 1/15/91 at 107–108)

12. Plaintiff and its members do not sell in the retail food market, and the Nugget brand does not appear on the shelves in grocery stores, convenience stores or other retail outlets. (Peralta 1/15/91 at 104–106, 1/16/91 at 29)

13. I find that the food service market constitutes commercial and institutional purchasers who serve prepared products to consumers who are away from their homes. In particular, restaurants, hotels, schools, and institutions including but not limited to health care facilities, hospitals, nursing homes, prisons, summer camps and universities. In addition, I find that the food service market includes the deli sections of supermarkets and convenience stores, and "cash-and-carry" outlets operated by distributors.

14. On November 3, 1925, a trademark of the word "Nugget" for certain food products was registered to plaintiff's predecessor company, based on continuous use of the mark dating back to June 1, 1916. (Plaintiff's Exh. 33– U.S.Reg. No. 205,122,) This mark was later acquired by Frank M. Wilson Co., which distributed food products, canned fruit, and vegetables under the Nugget brand to the food service market. (Peralta 1/15/91 at 119; Plaintiff's Exh. 34)

15. In 1966 a group of Nugget brand food service distributors purchased the Nugget trademark from the new owners of the Frank M. Wilson, Co. Plaintiff started operating as a purchasing cooperative on October 1, 1966. (Peralta 1/15/91 at 119; Plaintiff's Exh. 34)

16. During 1967, approximately 50 to 60 members of Nugget Distributors, Inc. purchased $15 million worth of products under the Nugget registered trademarks. (Peralta 1/15/91 at 119; Plaintiff's Exh. 34) Since 1967, membership in plaintiff's cooperative has grown to approximately 185 distributors purchasing approximately $500 million of Nugget brand products per annum. Plaintiff's distributors' sales of products under the "Nugget" trademark to food service market customers approximates $526 million. (Peralta 1/16/91 at 9; Plaintiff's Exh. 41)

17. Currently, plaintiff markets over 27,000 products under the Nugget brand.

(Peralta 1/15/91 at 110) These products are subject to a family of U.S. federal trademark registrations for the word "Nugget" appearing as follows:

# Nugget

18. Plaintiff's family of federal trademark registrations includes the following 23 trademarks consisting of the word "Nugget" as illustrated above:

| Registration No. | Description |
| --- | --- |
| 852,812 | Paper/plastic items |
| 869,074 | Canned/frozen food items |
| 854,417 | Paper/plastic items |
| 832,553 | Paper/plastic/aluminum items |
| 831,951 | Cooking wines |
| 840,717 | Cleaning supplies |
| 278,452 | Canned food items |
| 758,505 | Canned food items |
| 857,613 | Paper/plastic items |
| 1,079,172 | Paper/plastic items, cleaning supplies |
| 1,167,573 | Non-alcoholic cocktail mixes |
| 1,106,397 | Canned/frozen food items, chemicals, food |
| 1,001,560 | Plastic/glass items |
| 835,579 | Flavorings/extracts |
| 1,001,111 | Bakery food items |
| 1,087,769 | Cleaning equipment |
| 857,581 | Paper items |
| 852,170 | Cookware |
| 1,122,811 | Restaurant equipment |
| 1,238,627 | Food items |
| 1,251,504 | Cleaning/cooking equipment |
| 1,338,541 | Non-food equipment |

19. Plaintiff's family of "Nugget" trademarks also includes eleven U.S. registrations for the word "NUGGET" with the following depiction of a miner and burro:

| Registration No. | Description |
| --- | --- |
| 886,489 | Non-food equipment |
| 1,106,396 | Canned/frozen food items |
| 869,076 | Canned food items |
| 935,246 | Candles |
| 975,317 | Cookware |

| Registration No. | Description |
|---|---|
| 974,938 | Cooking equipment |
| 869,076 | Canned food items |
| 1,004,918 | Insurance |
| 1,027,789 | Non-food equipment |
| 1,110,885 | Paper items/kitchen equipment |

(Plaintiff's Exh. 33; Peralta 1/15/91 at 112)

---

20. Among the valid and subsisting U.S. trademarks consisting exclusively of the word "Nugget," plaintiff is owner of all right, title and interest in the following two trademarks specifically covering fish and seafood products that Nugget distributes in the food service market: Mark: NUGGET; Reg. No.: 869,074; Date: 5/6/69; Goods and Services Covered: Canned fruits, canned vegetables, frozen fruits, frozen breaded shrimp, frozen peeled and deveined shrimp, frozen precooked breaded fish portions, frozen precooked breaded fish sticks, frozen concentrated orange juice; First use: June 1, 1916. Mark: NUGGET; Reg.: No. 1,106,397; Date: 11/21/78; Goods and Services Covered: Canned and/or frozen and/or refrigerated food items, including, *inter alia*, seafood and prepared seafood entrees; First use: June 1, 1916. These registrations have become incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065. (JSF Para. 6; Plaintiff's Exhs. 29 and 30)

21. Also, plaintiff is the owner of all right, title and interest in the following valid and subsisting service mark registration: Mark: NUGGET; Reg. No.: 1,338,-541; Date: 5/28/85; Goods and Services Covered: Distribution services—namely, distribution of foods, cleaning products, kitchen appliances, tableware, furniture, and related products to restaurants, hotels, school and institutions; First use: July 1, 1967. (JSF Para 6; Plaintiff's Exh. 31; Peralta 1/15/91 at 96–97)

22. Plaintiff's distribution of Nugget brand fish and seafood products in the food service market generates between $40 and $50 million annually. (Peralta 1/15/91 at 138)

23. Since the 1970's, plaintiff and its members have used the Nugget mark on numerous fish products, including portion cuts and fillets, catfish, clams, cod, crab, flounder, haddock, halibut, lobster, oysters, perch, pike, pollack, pompano, salmon, red snapper, scallops, shrimp, sole, trout, whiting, and seafood patties. (Plaintiff's Exh. 6; Whelan 1/15/91 at 31) Currently, approximately 500 of the 27,000 food service products sold by Nugget distributors fall under the Nugget brand fish and fish products. (Peralta 1/15/91 at 112)

24. Nineteen Nugget brand fish products are currently distributed by Ettline Foods Corp., a Nugget distributor in York, Pennsylvania. (Whelan 1/15/91 at 20–23; Plaintiff's Exh. 1 & 2)

25. Since its inception in 1915, the Nugget trademark has been advertised and promoted. (Rasmussen 1/17/91 at 75) Plaintiff and its members have advertised and promoted the Nugget brand, including its fish and seafood products, since acquiring the Nugget trademark in 1966. (Plaintiff's Exh. 6; Whelan 1/15/91 at 31) Plaintiff and its members promote annually a "National Seafood Month" to boost sales of Nugget fish and seafood products. (Plaintiff Exh. 3; Whelan 1/15/91 at 24)

26. When advertising and promoting the Nugget brands, plaintiff and its members focus attention on one word, "Nugget." Although "Nugget" brand labels with the depiction of a miner and burro appear on many Nugget products, including fish products (Clark 1/16/91 at 87–88), the miner and burro design does not typically accompany the word "Nugget" in the advertising and promotion of the "Nugget" mark. (Whelan 1/15/91 at 52; Plaintiff's Exh. 14, 15, & 16)

27. During the past ten years, plaintiff, through its central office, has placed advertisement in over twenty trade publications. (Rasmussen 1/17/91 at 87–92) During the past five years, plaintiff's central office has spent between $3 million and $4 million on

advertising. (Rasmussen 1/17/91 at 89) Plaintiff's central office places advertisements in trade journals advertising "Nugget" (Rasmussen 1/17/91 at 90–91; Wallace 1/17/91 at 28) and spends about $680,000 annually on advertising the Nugget name. (Rasmussen 1/17/91 at 89; Peralta 1/15/91 at 135–136; Plaintiff's Exh. 41)

28. Plaintiff and its members actively promote the Nugget brand by participating in trade shows in the food service industry. Since 1973 Ettline Foods Corp., a single distributor, has participated in hundreds of trade shows where the Nugget trademark is prominently displayed. (Whelan 1/15/91 at 37–38; Plaintiff's Exh. 9 & 10) Also, plaintiff and its members have appeared, for example, at the following trade shows: Distributors Shows: April 14, 1989, Better Brands/RI; April 24, 1989, Quandts/Saratoga Springs, NY; May 7, 1989, Valley Foods/El Paso, TX; June 3, 1989, Summit Distrib/Nashville, TN; June 6, 1989, D. Canale & Sons/Memphis, TN; July 10, 1989, Lady Baltimore/Kansas City, MO; October 10, 1989, Ettline Foods/PA; February 3, 1990, George O. Pasqual Co./Peoria, IL; March 27–28, 1990, Ellenbee–Leggett/Ft. Mitchell, KY; March 30, 1990, Quandts/Amsterdam, NY; March 31, 1990, T.T. Todd/Pensacola, FL.; Sellathons: July 1989, Boston, MA; January 1990, San Francisco, CA.; Meetings: Oct. 23–27, 1989, Am. Dietetic Assn./Kansas City, MO; August 7–8, 1989, Dietary Mgrs. Assn./Orlando, FL; July 11–12, 1989, Am. Soc. Hosp. Food Svc. Assn./Boston, MA; July 24–26, 1989, Am. Food Svc. Assn./Nashville, TN. (Rasmussen 1/17/91 at 88)

29. In addition to the advertising efforts of plaintiff's central office, plaintiff's individual members incurred advertising expenses by using "camera-ready" art to run advertisements in brochures and magazines of local chapters of dietician (Whelan 1/15/91 at 39; Plaintiff's Exh. 14), school (Whelan 1/15/91 at 39–40; Plaintiff's Exh. 15), and special holiday publications. (Whelan 1/15/91 at 39–40; Plaintiff's Exh. 16)

30. Martin Whelan, President of Ettline Foods Corp., a single Nugget Distributor, testified as a representative Nugget distributor. He stated that Ettline spends from $100,000 to $150,000 a year on adver-

tising and promotional activities, of which 75% to 80% goes to promote directly the "Nugget" label. (Whelan 1/15/91 at 45–46; Plaintiff's Exh. 46) The Nugget label appears on Ettline's corporate stationary (Plaintiff's Exh. 5; Whelan 1/15/91 at 42) and customer account statements. (Plaintiff's Exh. 5a; Whelan 1/15/91 at 42) Whelan testified that the Nugget trademark "is absolutely critical." (Whelan 1/15/91 at 27) He went on to testify that distributors "sell and promote that label as actively and as aggressively as we know how." (Whelan 1/15/91 at 28) Finally, he testified that the "mark is what Ettline Foods is all about, that's what we have to sell is Nugget branded products." (Whelan 1/15/91 at 38) I find Mr. Whelan to be a credible witness.

31. Dennis Anderson, Director of Sales and Marketing for Parkway Food Service, a Nugget Distributor, testified that Parkway Food Service spends $250,000 annually for advertising and promotion of the Nugget mark at trade shows (Anderson 1/15/91 at 71–72), on the company's fleet of trucks (Anderson 1/125/91 at 71), corporate stationary, business cards, calendars, and on promotional thermometers, clocks, name plates, stickers and plastic drinking bottles (Anderson 21/15/91 at 71, 74; Plaintiff's Exhs. 22 & 26 & 27), approximately half of which was reimbursed by the company's suppliers. (Anderson 1/15/91 at 84) Mr. Anderson testified that there is not "one piece of material that goes out of Parkway Food Service without ... some identification of Nugget on it." (Anderson 1/15/91 65–66, cross-exam. 83–90) I find Mr. Anderson to be a credible witness.

32. The majority of advertising and promotional expenditures involving the "Nugget" label are incurred directly by plaintiff's suppliers. Plaintiff's members purchase their "Nugget" brand products from a group of over 650 suppliers. (Peralta 1/15/91 at 131; Plaintiff's Exh. 38) The advertising and promotion of the "Nugget" mark by plaintiff's member distributors and suppliers amount to between $5.2 million (Peralta 1/156/91 at 10) and $8 million (Rasmussen 1/17/91 at 102) annually.

# 9

33. Gilbert Kretzer, Vice President and Executive Director of the International Foodservice Distributors Association, testified as an expert in the food service industry. He testified that the Nugget brand is widely recognized in the food service market. Mr. Gilbert also testified that in the food service market, the word "Nugget" is universally understood to mean "a distribution organization that packs products under the Nugget label." (Kretzer 1/16/91 at 116–117; Peralta 1/16/91 at 12–13) Mr. Kretzer expressed the opinion that there was a "very substantial likelihood" that another company's use of the trademark, or use of the trade name "Mr. Nugget" would lead to confusion if used in the food service market. (Kretzer 1/16/91 at 121) I find Mr. Kretzer to be a credible witness.

34. Ms. Jane Y. Wallace, Vice President of Cahners Publishing Co. and Publisher of Restaurants & Institutions Magazine, testified as an expert in the food service industry. (Wallace 1/17/91 at 24; Plaintiff's Exh. 74) She reviewed advertising by plaintiff in the five major industry magazines and found that it increased during the period from 1979 to 1990. (Wallace 1/17/91 at 28–29) Ms. Wallace testified that the name "Nugget" was understood in the food service industry to mean the plaintiff Nugget distributors, a product of Nugget Distributors, or both. (Wallace 1/17/91 at 32) I find Ms. Wallace to be a credible witness.

35. I find that based on the testimony of Peter Toso, Executive Vice President of Starch INRA Hooper (Toso 1/17/91 at 41–67), the plaintiff's advertising is effective.

36. Plaintiff controls the quality of the goods marketed by its members in licensing agreements between plaintiff and the suppliers. (Rasmussen 1/17/91 at 93) Plaintiff sets specifications for its suppliers' products and conducts a rigorous inspection, audit and testing program of supplier facilities and products. (Clark 1/16/91 at 58–94; Plaintiff's Exh. 49 & 49a)

37. Plaintiff controls the use of the Nugget label by its members and suppliers through detailed packaging specifications and guidelines. (Clark 1/16/91 at 94;

Plaintiff Ex. 95 & 95) Plaintiff's Marketing Department exerts control over the use of its mark in advertising. (Rasmussen 1/17/91 at 76; Plaintiff's Exhs. 46–48)

38. Defendant is selling "shrimp nuggets," "seafood nuggets" and "clam nuggets" under the trademark "Mr. Nugget." The products are substantially identical to those offered by plaintiff's members (Clark 1/16/91 at 77; Whelan 1/15/91 at 49; Anderson 1/15/91 at 80) and are offered by defendant at similar prices. (Whelan 1/15/91 at 49; Anderson 1/15/91 at 80)

39. Dr. Brokans, defendant's President and Chairman of the Board, has been employed in the fish and seafood product industry and been in near continuous contact with the Nugget brand since the 1960's. He is familiar with the use of the Nugget label on fish and seafood products. (Brokans 1/16/91 at 142–153) Two of Mr. Brokans' former employers were licensed Nugget brand suppliers and were supplying Nugget brand seafood products to plaintiff's members during Dr. Brokans' employment with the firms. (Peralta 1/16/91 at 70; Plaintiff's Exh. 42) While employed by one of these firms, Dr. Brokans' duties included responsibility for applying the Nugget label to seafood products. (Brokans 1/16/91 at 142)

40. Dr. Brokans testified that he chose the name "Mr. Nugget" for his product and corporation, in part, because of its descriptive value. (Brokans 1/16/91 at 140 & 152) Dr. Brokans also testified that he never thought about Nugget distributors when selecting the name "Mr. Nugget" for his fish and seafood products. (Brokans 1/16/91 at 152) After observing the demeanor and conduct of Dr. Brokans and weighing his testimony, I find he is not a credible witness. Moreover, I find that Dr. Brokans' choice of the name nugget for his fish and seafood products to constitute an objective and willful misappropriation of the plaintiff's trademark, trade name and service mark.

41. Plaintiff first learned of defendant's product in late 1988, when Dennis Anderson of Parkway Food Service report-

ed reading a "Mr. Nugget" advertisement that appeared in a Pennsylvania-based trade publication. (Anderson 1/15/91 at 77)

42. Defendant is using the trademark and trade name "Mr. Nugget" in the food service industry, including, but not limited to, the use of a label appearing as follows:

43. The term "Mr." as a prefix to the word "Nugget" in the defendant's trademark does not effectively distinguish the defendant's name from that of the plaintiff as a designator of source in the food service market. (Kretzer 1/16/91 at 123–124; Whelan 1/15/91 at 53; Anderson 1/15/91 at 82; Peralta 1/16/91 at 37; Wallace 1/17/91 at 34) To the extent that defendant's witness Gary D. Krugman contradicts this finding, I find his testimony to be unpersuasive. Also, Mr. Krugman admitted that he had no knowledge of the food service market. (Krugman 1/18/91 at 115)

44. The distinction between the design portion of the parties' marks is insufficient to lessen the likelihood of confusion between the two. This is compounded by the fact that a substantial volume of business in the food service market is conducted over the telephone. Therefore, no difference in design would be noticeable. (Whelan 1/15/91 at 53) Also, neither a high school nor a college degree is required to be employed as a purchaser in the food service market. (Anderson 1/15/91 at 81) I find that the level of sophistication among purchasers in the food service market is not so high that there is not a strong likelihood of confusion between the parties' marks.

45. Plaintiff's amended complaint seeks, in part, a modification of defendant's U.S. trademark registration pursuant to

Section 37 of the Lanham Act, 15 U.S.C. § 1119. Defendant's application to register the mark of "Mr. Nugget" and the design matured into Certificate of Registration No. 1,511,920. It covers the trademark "Mr. Nugget" and design for "partially cooked, frozen, lightly breaded fish and seafood." (JSF Para. 12)

46. This registration was granted *ex parte* (Krugman 1/18/91 at 49, 95–97) and without the benefit of evidence of the strength of plaintiff's mark in the food service market.

47. To the extent that this registration includes a disclaimer, I find that it does not affect the likelihood that confusion would arise in the relevant market where the mark is used. (Defendant's Exh. 2; Krugman 1/18/91 at 100)

48. To illustrate the descriptive meaning of the word "nugget," which is not in dispute, defendant introduced a series of "third-party registrations" on file with the U.S. Patent and Trademark Office for marks including the word "nugget" as listed in a "Thomson and Thomson report." (Defendant's Exh. 38)

49. The only third-party registration of record consisting exclusively of the word "nugget" was issued to Armour & Co. for bacon and hams. (Defendant's Exh. 38) However, on April 14, 1977, Armour & Co. executed an agreement with plaintiff which recognized plaintiff's exclusive right to

that mark in the food service market and limited Armour's use of the mark to the retail market only. (Plaintiff's Exh. 45; Peralta 1/16/91 at 20)

50. All but three of the remaining third-party registrations in the Thomson and Thomson report involve the designation of a product itself as a "nugget" or "nuggets," preceded by an adjective describing or characterizing the "nugget." (Defendant's Exh. 38) Of the remaining three uses that are not descriptive, there is no evidence that these marks are used in the food service market.

51. Ted Peralta, Executive Vice President of Nugget Distributors, Inc., testified to examples of the fair, descriptive use of the word "nugget" to denote a product and not a trademark use that would cause confusion as to source. (Peralta 1/16/91 at 14; see also Whelan 1/15/91 at 62; Wallace 1/17/91 at 31–32; Clark 1/16/91 at 102–103) I find the testimony of Mr. Peralta to be credible.

52. Mr. Krugman, an expert witness on trademark office practices and procedures, called to testify by defendant, testified as follows: "... I think it's clear from the registration and from what I've seen that the mark that the defendant owns, the registered mark, the Mr. Nugget with the designed portion, is a trademark use." (Krugman 1/18/91 at 126)

53. Plaintiff established that it was unaware of any trademark use of the name "Nugget" in the food service market other than its own and that of the defendant. (Whelan 1/15/91 at 55; Anderson 1/15/91 at 82; Peralta 1/16/91 at 14)

54. Defendant introduced evidence that plaintiff failed to pursue a trademark infringement action against Nugget Industries, Inc. (Defendant Exh. 44; Peralta 1/16/91 at 41–42) However, Nugget Industries, Inc. has not used the disputed mark to identify any product or service in any advertising or as a trade name. (Plaintiff's Exh. 100; Peralta 1/16/91 at 25–27)

55. Defendant introduced evidence that plaintiff failed to pursue a trademark infringement action against Nugget Oil Co., which operates some 50 food convenience stores located in Florida and Alabama. These stores have a sign consisting of the words NUGGET STORE with a donkey and prospector. (Defendant's Exh. 45; Peralta 1/16/91 at 45–46) Defendant contends that plaintiff's failure to enforce the mark bars plaintiff from now enforcing its trademark against defendant. However, Nugget Oil, Inc. used its mark in the retail market and was not using it to market any product or service in the food service market to food service customers. (Peralta 1/16/91 at 27–29)

56. Plaintiff has enforced its trademark. (Peralta 1/16/91 at 18, 29–30; Clark 1/16/91 at 97–98)

57. I find defendant's evidence of plaintiff's failure to enforce its trademark to be unpersuasive.

58. Defendant first used the trademark MR. NUGGET in January 1987 (I. Ardolino 1/18/91 at 10) for its fish products, consisting of "Shrimp Nuggets," "Seafood Nuggets" and "Clam Nuggets." (JSF Para. 9)

59. Defendant promotes its "MR. NUGGET" products at trade shows by prominently displaying banners, posters, aprons and other promotional materials with "MR. NUGGET" written on it. The people attending the trade shows are vendors, operators, distributors, students in the food business and dieticians, representing both the retail and the food service markets. (R. Ardolino 1/17/91 at 127–128)

60. Defendant's product is packed in retail packaging (Defendant's Exh. 12–14; R. Ardolino 1/17/91 at 5) and in ten or 18 pound bulk packages. (R. Ardolino 1/17/91 at 3) The ten and 18 pound packages are sold both at the retail level and the food service level. (R. Ardolino 1/17/91 at 4)

61. During defendant's first year of operation, which ended on April 30, 1988, defendant spent $8,906.00 on advertising and promotion and incurred a net loss. (I. Ardolino 1/18/91 at 14)

62. During the fiscal year that ended April 30, 1990, defendant's sales in the food service market amounted to $95,452.00, compared to $142,737.00 in retail sales, (I. Ardolino 1/18/91 at 16–18), and defendant

spent 12.5% of the total gross sales of its product under the MR. NUGGET mark on advertising and promotion. (I. Ardolino 1/18/91 at 21)

63. For the period beginning May 1, 1990 and ending November 30, 1990, defendant spent 16.4% of its gross sales on advertising and promotion. (I. Ardolino 1/18/91 at 19)

64. Defendant manufactures its nugget products, which are sold to distributors, who subsequently resell the products in the retail market and the food service market. The three largest purchasers who distribute defendants product distribute it to both the retail and the food service markets. (R. Ardolino 1/17/91 at 3) Defendant contends that the effect of enjoining the resale of the Mr. Nugget product at the food service level would potentially put the defendant out of business. (R. Ardolino 1/17/91 at 145–146) It would be impossible for the defendant to differentiate between the retail and food service patrons attending trade shows. (R. Ardolino 1/17/91 at 145–146) Any attempt to change the trademark for the product of goods sold in the food service market would lose the "carry over" between the retail sales and food service sales. (R. Ardolino 1/17/91 at 33–34)

65. I find defendant's arguments against the remedy requested by plaintiff to be unpersuasive.

66. Plaintiff knows of no instances of actual confusion between the trademarks. (Interrogatory answer 1/18/91 at 151–152)

67. I find that any ambiguity that may have been created in a letter dated March 23, 1989 from Steve Grubb, Esquire, local counsel to plaintiff, to defendant to be irrelevant.

68. I find that defendant has adopted and is using a trademark and trade name, "MR. Nugget" and "MR. Nugget, Inc.," which are confusingly similar to plaintiff's trademark, trade name and service mark "Nugget." Defendant is using this trademark and trade name in connection with the marketing and sale of partially cooked, frozen, lightly breaded fish and seafood.

Each name and mark is dominated by the identical word "Nugget."

69. I find that the sound, meaning and appearance of defendant's trade name "MR. Nugget, Inc." and trademark "MR. Nugget" are not materially distinguished from plaintiff's name and mark "Nugget" by inclusion of the prefix "MR." or by the appearance of a miner and burro on some of plaintiff's labels.

70. I find that the parties' products are substantially identical, and are sold in the same channels of trade to the same class of purchasers in the food service market.

71. I find that defendant's use of plaintiff's mark is likely to create confusion among the relevant class of purchasers.

72. I find that plaintiff's use of the name "Nugget" is an arbitrary and fanciful mark with a substantial degree of secondary meaning in the food service market.

73. I find that the overall impression created by the parties' marks is essentially the same.

74. I find that the defendant's use of the word nugget in the trade name "MR. Nugget, Inc." and mark "MR. Nugget" is a trademark use, not a descriptive use.

75. I find that the defendant's continued use of the trade name "MR. Nugget, Inc." and trademark "MR. Nugget" is likely to create confusion, mistake and deception among purchasers and the relevant public, leading it to believe falsely that defendant's products are those of the plaintiff.

76. I find that defendant's use of the trade name "MR. Nugget, Inc." and trademark "MR. Nugget" in the manufacture and distribution of processed fish and seafood products in the food service market has resulted in the misappropriation of plaintiff's trade name and trademark, constitutes a continuing injury to the business and reputation of plaintiff, and will dilute the distinctive quality of plaintiff's tradename and trade mark "Nugget."

77. I find that there is insufficient evidence to establish that defendant used the word "nugget" as a service mark.

## II. *Discussion*

In *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277 (3d Cir.1991), the Third Circuit recently reviewed the elements required to establish a trademark infringement. There, the court outlined three elements as follows: "(1) the marks are valid and legally protestable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." *Id.* at 291.

▮ It is stipulated by the parties to this action that plaintiff's trademark is incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065. *See* Joint Stipulation of Facts para. 6. In *Ford* the court held that "[i]f a mark at issue was federally registered and had become 'incontestable', pursuant to 15 U.S.C. §§ 1058 and 1065, validity, legal protectability, and ownership are proved." *Id.* at 291. Also, plaintiff argues that the actual and continuous use of the Nugget trademark, along with its first use, established plaintiff's protectable interest. *Hydro–Dynamics, Inc. v. George Putman & Co., Inc.*, 811 F.2d 1470 (Fed.Cir.1987). I conclude that plaintiff has established that the Nugget mark is valid and protectable, and is owned by the plaintiff.

▮ The third and final element to establish a trademark infringement is the likelihood of confusion between the marks. I note that actual confusion need not be demonstrated. The likelihood of confusion is all that is necessary. *See Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187 (3d Cir.1990).

▮ Moreover, when the owner of the trademark and the infringer "deal in competing food or services, the court need rarely look beyond the mark itself. In such cases the court will generally examine the registered mark ... and compare it against the challenged mark." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). As noted in my findings of fact, I have determined that plaintiff and defendant are direct competitors seeking to sell the same product to the same class of purchasers in the food service market. Hence, this inquiry further requires that I determine whether plaintiff's mark is "inherently distinctive or has acquired sufficient secondary meaning to make it distinctive and compare it against the challenged mark." *Bell Publishing Corp. v. Bantam Doubleday Dell*, 17 USPQ2d 1634, 1636, 1990 WL 55102 (E.D.Pa.1990).

▮ Plaintiff has submitted considerable evidence supporting its assertion that the mark "Nugget" has secondary meaning in the food service market. Secondary meaning is demonstrated when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself." *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 152 (3d Cir.1984). Although there is no clear consensus on the elements that define secondary meaning, the Third Circuit has listed "non-exclusive" factors to be considered as: "the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion." *Ford* at 292 (citations omitted).

▮ It is clear from my findings of fact that plaintiff has established secondary meaning. I touch upon but a few factors here. The mark has been prominently and exclusively used since 1916 by plaintiff, its predecessors, its members and its suppliers. Plaintiff has established its extensive advertising and promotion of the mark, including the use of trade journals. And plaintiff's sales, number of customers and the buyer association of the mark with plaintiff further support plaintiff's claim of secondary meaning. Finally, the expert testimony presented at trial establishes plaintiff as one of the primary food service distribution and buying groups in the United States.

Also, I am unpersuaded by defendant's argument that its use of the word "nugget" is descriptive, and that plaintiff's en-

forcement history of its mark and the existence of third-party registrations has lessened, to any meaningful extent, the strength of plaintiff's mark.

Ultimately, I conclude that the overall impression created by the parties' marks is essentially the same. Because of the identical nature of the products and the competing market at issue, it is unnecessary that I address the test to determine likelihood of confusion as outlined by the Third Circuit in *Scott Paper Co., v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3d Cir.1978). Nonetheless, I note that under this test plaintiff has established clearly that a likelihood of confusion between the marks exists. *See Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460 (3d Cir.1983) ("Though we did draw a formal distinction between likelihood of confusion and secondary meaning in that case [*Scott*], as noted above, proof of one is proof of the other." *Id.* at 465).

Plaintiff has satisfied the third element of the test set down in *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277 (3d Cir.1991). Plaintiff has met its burden in proving that defendant's use of the word nugget constituted an infringement of defendant's trademark.

■ Plaintiff's unfair competition claim under Section 43 of the Lanham Act, 15 U.S.C. § 1125, is governed by the legal standard applicable to the trademark infringement claim. *Bell Publishing Corp. v. Bantam Doubleday Dell,* 17 USPQ2d 1634, 1990 WL 55102 (E.D.Pa.1990); *SmithKine Beckman Corp. v. Pennex Products Co.,* 605 F.Supp. 746 (E.D.Pa. 1985) ("Since trademark infringement is a narrower concept, any finding that it has occurred will, by necessity, support an additional finding that the defendant is also guilty of unfair competition." *Id.* at 749). Defendant has engaged in unfair competition.

■ Turning to plaintiff's claims under Pennsylvania law, a common law trademark infringement is governed by identical standards under the Lanham Act. *American Diabetes Ass'n, Inc. v. National Diabetes Ass'n,* 533 F.Supp. 16, 18 n. 1 (E.D.Pa.1981), *aff'd,* 681 F.2d 804 (3d Cir.

1982); *Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc.,* 669 F.Supp. 1297, 1317 (E.D.Pa.1987). Defendant's infringement of plaintiff's trademark under the Lanham Act constitutes infringement under the common law of Pennsylvania.

■ Plaintiff's claim under the Pennsylvania Anti–Dilution statute, 54 Pa. Cons.Stat.Ann. § 1124, also succeeds. To prevail on a claim under this section, the plaintiff must establish, *inter alia,* that its mark has a "distinctive quality." This requirement is satisfied if the mark has secondary meaning in the infringer's market. *American Intern. Group v. American Inter. Airways,* 726 F.Supp. 1470, 1482 (E.D.Pa.1989). I have already held that plaintiff's mark has secondary meaning. Also, whether there is an absence of predatory intent on the part of the infringer is relevant. *Moore Push–Pin Co. v. Moore Business Forms, Inc.,* 678 F.Supp. 113 (E.D.Pa.1987). In my findings of fact I found that defendant willfully misappropriated plaintiff's trademark and trade name. Moreover, there is sufficient evidence to support a finding that defendant's use of the plaintiff's mark is likely to dilute the mark. Based on the foregoing, I conclude that plaintiff has succeeded on its claim under the Pennsylvania Anti–Dilution Statute.

■ Finally, plaintiff seeks an injunction limited to a specific market segment, the food service market. Although this may impose a hardship upon defendant, I am persuaded that an injunction of this nature is appropriate in this action. However, I do find that there is insufficient proof of defendant's use of the word "nugget" as a service mark. Therefore, while the injunction shall apply to the food service industry, it will cover defendant's use of a trademark and trade name.

## III. *Conclusions of Law*

1. This action arises under the Federal Trademark Act of 1946, §§ 15 U.S.C. 1051 *et seq.* (the "Lanham Act"). This court has jurisdiction over counts one and two of this action pursuant to 15 U.S.C. § 1121 and 28

U.S.C. §§ 1331 and 1338(a), and over the pendent claims alleged in counts three and four pursuant to 28 U.S.C. § 1338(b). Venue in this court is proper pursuant to 28 U.S.C. § 1391(b).

2. Plaintiff's U.S. Registration Nos. 869,074 and 1,106,397 have become incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065. Defendant has not raised any ground to defeat the infringement of this incontestable mark.

3. Defendant's use of the "Mr. Nugget" trademark and trade name is not a "fair descriptive use" under Section 15 U.S.C. § 1115(b)(4).

4. Plaintiff has met its burden of proof in establishing that defendant's use of the word "nugget" in its trademark and trade name constitutes an infringement of plaintiff's federal trademark and service mark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

5. Plaintiff has met its burden of proof in establishing that defendant's use of the word "nugget" in its trademark and trade name constitutes an act of unfair competition, false designation of origin and false representation of affiliation, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

6. Plaintiff has met its burden of proof in establishing that defendants use of the word "nugget" in its trademark and trade name constitutes a violation of plaintiff's common law rights in its trademark and unfair competition under common law of the Commonwealth of Pennsylvania.

7. Plaintiff has met its burden of proof in establishing that defendant's use of the word "nugget" in its trade name and trademark injures plaintiff's business reputation and dilutes plaintiff's trade name, service mark and trademark in violation of Pennsylvania's Anti–Dilution statute, 54 Pa. Cons.Stat.Ann. § 1124 (Purdon 1986 Supp.).

8. Defendant's federal registration shall be modified pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119, limiting the permissible channels of commerce to the retail market only.

9. Plaintiff is entitled to entry of judgment against defendant on all counts of its amended complaint.